UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

KITSAP COUNTY, on behalf of itself and
similarly situated counties and cities,

Plaintiff,

v.

MCKINSEY & COMPANY, INC., UNITED
STATES and MCKINSEY & COMPANY, INC.,

Defendants.

No. 2:21-cv-01564

**COMPLAINT—CLASS ACTION**

JURY DEMAND

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   PARTIES ............................................................................................ 6

III.  JURISDICTION AND VENUE .......................................................... 7

IV.   FACTUAL ALLEGATIONS ............................................................... 8

      A.    McKinsey's Business Model: "Consulting Is More Than Giving
            Advice." ................................................................................... 8

      B.    Purdue Pleaded Guilty to Misbranding OxyContin and Was Bound
            by a CIA. ................................................................................ 10

      C.    Purdue Hired McKinsey to Boost Opioid Sales Despite the CIA. ................... 12

            1.    The Sacklers Distanced Themselves from Purdue. ............................. 12

            2.    Purdue Hired McKinsey to Devise and Implement an
                  OxyContin Sales Strategy Consistent with the Sacklers'
                  Goals. ........................................................................... 14

      D.    Purdue Relied on McKinsey. ...................................................... 16

      E.    McKinsey Developed a Granular Strategy for Purdue. ...................... 18

            1.    Granular Growth. ........................................................... 18

            2.    "Identifying Granular Growth Opportunities for
                  OxyContin." ................................................................... 20

                  a.    Marketing — Countering Emotional Messages ................ 20

                  b.    Targeting — Selling More OxyContin to Existing
                        High Prescribers. ................................................. 21

                  c.    Titration — Selling Higher Doses of OxyContin .............. 23

                  d.    Covered Persons — Sales Quotas and Incentive
                        Compensation ..................................................... 24

                  e.    Increasing the Overall Size of the Opioid Market:
                        The Larger the Pie, the Larger the Slice ..................... 26

      F.    The Transformation: McKinsey Worked with Purdue to Implement
            its Strategies ......................................................................... 27

COMPLAINT—CLASS ACTION - i
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

G.     Project Turbocharge. ..................................................................... 28

H.     McKinsey's Efforts Triple OxyContin Sales. .................................. 31

I.     McKinsey Acted to Maximize OxyContin Prescriptions Despite
       Knowing About the Dangers of Opioids........................................... 33

J.     Purdue's 2020 Guilty Plea and McKinsey's Recent Statement. ....... 39

K.     Impact of McKinsey and Purdue's Conduct. .................................. 41

L.     The Opioid Epidemic Caused by McKinsey and Purdue Has
       Directly Affected Kitsap County. .................................................. 42

       1.     Kitsap County Human Services has incurred enormous
              costs in dealing with the crisis caused by Defendants........... 46

       2.     The County's justice system—both criminal and civil—has
              incurred substantial costs in responding to the epidemic
              caused by Defendants. ......................................................... 46

              a.     Kitsap County Prosecuting Attorney's Office and
                     Public Defender Costs.............................................. 47

              b.     Kitsap County Sheriff's Office.................................. 47

              c.     Kitsap County Jail................................................... 48

       3.     The Parks Department is also not immune to Defendants'
              conduct................................................................................ 49

       4.     The opioid epidemic has also contributed to homelessness
              in Kitsap County.................................................................. 49

M.     The Washington Attorney General Expressly Did Not Release the
       Claims of Local Governments in its Settlement with McKinsey. ...... 51

N.     No Federal Agency Action, Including by the FDA, Can Provide
       the Relief Kitsap County Seeks Here............................................... 52

V.     FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE
       RICO ACT: THE OPIOID MARKETING ENTERPRISE........................... 53

A.     The Common Purpose and Scheme of the Opioid Marketing
       Enterprise...................................................................................... 53

B.     The Conduct of the Opioid Marketing Enterprise Violated Civil
       RICO. ........................................................................................... 55

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

C.      Pattern of Racketeering Activity .................................................. 56

VI.    TOLLING OF STATUTES OF LIMITATIONS .................................. 60

VII.   CLASS ACTION ALLEGATIONS ........................................................ 62

A.     Class Definitions. ................................................................... 62

B.     Requirements of Rule 23. ....................................................... 62

VIII.  CLAIMS FOR RELIEF .......................................................................... 64

COUNT ONE — VIOLATION of RICO, 18 U.S.C. § 1961, *et seq.* ............ 64

COUNT TWO — NEGLIGENCE ................................................................ 72

COUNT THREE — GROSS NEGLIGENCE .............................................. 72

COUNT FOUR — PUBLIC NUISANCE .................................................... 73

COUNT FIVE — CIVIL CONSPIRACY .................................................... 76

COUNT SIX — CIVIL AIDING AND ABETTING ................................... 78

COUNT SEVEN — UNJUST ENRICHMENT .......................................... 78

COUNT EIGHT — VIOLATIONS OF THE WASHINGTON
        CONSUMER PROTECTION ACT, RCW 19.86, *et seq.* ............... 79

PRAYER FOR RELIEF .................................................................................. 81

JURY TRIAL DEMAND ............................................................................... 83

COMPLAINT—CLASS ACTION - iii
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Plaintiff, individually and on behalf of all similarly situated counties and cities in Washington State, brings this Class Action Complaint ("Complaint") against McKinsey & Company, Inc., United States, and McKinsey & Company, Inc. (collectively, "McKinsey") and alleges the following based upon personal knowledge, information and belief, and investigation of counsel:

## I.    INTRODUCTION

1.    This case arises from the worst man-made epidemic in modern medical history—the misuse, abuse, and over-prescription of opioids. This crisis arose from the opioid manufacturers' deliberately deceptive marketing strategy to expand opioid use.

2.    On May 10, 2007, John L. Brownlee ("Brownlee"), United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P. ("Purdue"), relating to the misbranding of OxyContin. Brownlee stated:

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. . . . In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.[1]

3.    Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the United States Department of Health and Human Services ("HHS").[2] For a period of five years, ending in 2012, Purdue was obligated to

---

[1] John L. Brownlee, *The Purdue Frederick Company, Inc. and Top Executives Plead Guilty to Misbranding OxyContin; Will Pay over $600 Million*, U.S. Att'ys Off. W.D. Va. (May 10, 2007), http://www.usdoj.gov/usao/vaw/press_releases/purdue_frederick_10may2007.html [https://web.archive.org/web/20070512174719/http://www.usdoj.gov/usao/vaw/press_releases/purdue_frederick_10may2007.html].

[2] Corporate Integrity Agreement ("CIA"), *United States v. Purdue Frederick Co.*, No. 1:07-cr-00029-JPJ (W.D. Va. May 10, 2007), Dkt. # 5-5 through -6.

retain an Independent Monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives *vis-a-vis* their interactions with health care providers.

4.     In the wake of Purdue's accession to the CIA, Purdue faced newly imposed constraints on its sales and marketing practices. Despite the CIA's constraints (i.e., do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

5.     The problem was complex. As a result of the 2007 guilty plea, the Sacklers made the strategic decision to distance the family from Purdue, which was regarded as an increasingly "dangerous concentration of risk" for Purdue's owners. One week after the guilty plea was announced, David Sackler wrote to his father, Richard Sackler, and uncle, Jonathan Sackler, describing precisely what that "risk" was: legal liability for selling OxyContin. In response to Jonathan stating that "there is no basis to sue 'the family,'" David replied:

Message

| | |
|---|---|
| From: | David Sackler ▇▇▇▇▇▇▇▇▇▇▇▇▇▇ |
| Sent: | 5/17/2007 11:08:08 PM |
| To: | 'Sackler, Jonathan' ▇▇▇ Sackler, Dr Richard ▇▇▇▇▇▇▇ |
| CC: | Ives, Stephen A. ▇▇▇▇▇▇▇▇▇▇▇ |
| Subject: | RE: Idea |
| Attachments: | image001.jpg |

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America. This is the land of the free and the home of the blameless. We will be sued. Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

6.     Given concern over this "dangerous concentration of risk," the Sackler family spent considerable time and energy debating the best way to achieve distance from Purdue, and collectively considered a variety of options for doing so. One option was to sell the company to or merge the company with another pharmaceutical manufacturer. Shire was discussed as a possible target, as was Cephalon, Inc., UCB S.A., and Sepracor Inc. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

7.    Another option was to have Purdue borrow money in order to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, began to make substantial distributions of money from the company to themselves. Once again, the proceeds of the distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

8.    In order to pursue *either* of these options, the Sacklers needed to maximize opioid sales *in the short term* so as to make Purdue—by then the subject of substantial public scrutiny—appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender.

9.    Given the complexity of the problem and the constraints of the CIA, the Sacklers and Purdue realized they would need outside assistance. Purdue did not have the capabilities in-house to design and implement a sales strategy for OxyContin that would achieve the Sacklers' objectives. They turned to the global management consulting firm McKinsey, the Defendant in this case,[3] which had already been advising the Sacklers and Purdue for at least three years, for help with their new problem.

10.    McKinsey knew of the dangers of opioids and of Purdue's prior misconduct, but nonetheless accepted the assignment,[4] and by June 2009 McKinsey and Purdue were working together to maximize OxyContin sales. McKinsey devised a plan to work around the requirements of the CIA, suggesting a specific sales and marketing strategy based on McKinsey's own independent research and unique methodologies, and Purdue adopted that strategy. McKinsey then worked intimately with Purdue on an ongoing basis to implement its plan. Despite the strictures imposed by the CIA, OxyContin sales began to multiply.

---

[3] McKinsey has an international presence and has numerous corporate entities. On information and belief, the entities involved in the engagement with Purdue are McKinsey & Company, Inc., United States, and McKinsey & Company, Inc.

[4] This Complaint assumes that Purdue asked McKinsey to design and implement the strategy for boosting opioid sales, and McKinsey accepted Purdue's offer. What is known is that McKinsey performed the work for Purdue. For the purposes of this Complaint, Plaintiff assumes Purdue initiated the relationship with McKinsey. Should it arise that instead McKinsey pitched a proposal to increase OxyContin sales to Purdue, and Purdue accepted that proposal, then Plaintiff will amend this Complaint accordingly.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

11.    In 2012, Purdue's CIA ended, and with its expiration McKinsey's ongoing relationship[5] with Purdue flourished. In 2013, McKinsey proposed, and Purdue implemented with McKinsey's ongoing assistance, *Project Turbocharge*, a marketing strategy to increase opioids sales by ***hundreds of millions*** of dollars annually. Purdue then picked a new name—*E2E: Evolve 2 Excellence*—and adopted it as the theme of its 2014 national sales meeting. With McKinsey's assistance, Purdue trained its sales representatives to operate using McKinsey's strategy for selling OxyContin. The result: a final spasm of OxyContin sales before the inevitable decline of the drug.[6]

12.    McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating the growth of opioid sales to benefit Purdue.[7] On March 7, 2019, Kevin Sneader ("Sneader"), McKinsey's global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated, "[W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny—fair and unfair—will continue. It is the price we pay for being 'in the arena' and working on what matters."[8]

---

[5] McKinsey espouses the idea of the "transformational relationship." It is not a one-off seller of advice for any given Chief Executive Officer ("CEO") problem of the day. Rather, McKinsey argues that real value for the client derives from an ongoing "transformational" relationship with the firm. Duff McDonald, *The Firm: The Story of McKinsey and Its Secret Influence on American Business* at pp. 136-37 (2013) ("McKinsey no longer pitched itself as a project-to-project firm; from this point forth [the late 1970's], it sold itself to clients as an ongoing prodder of change, the kind a smart CEO would keep around indefinitely."). McKinsey's relationship with Purdue developed into exactly that kind of "transformational" relationship.

[6] On February 9, 2018, Purdue announced that it is no longer marketing opioids and disbanded its OxyContin sales force. Pharma L.P., *Purdue Pharma L.P. Issues Statement on Opioid Promotion* (Feb. 9, 2018), https://www.purduepharma.com/news/2018/02/09/purdue-pharma-l-p-issues-statement-on-opioid-promotion/.

[7] *See* Michael Forsythe & Walt Bogdanich, *McKinsey Advised Purdue Pharma How to 'Turbocharge' Opioid Sales, Lawsuit Says*, N.Y. Times (Feb. 1, 2019), https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opiods.html.

[8] *See "The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, Fortune Mag. (Mar. 8, 2019, 9:30 AM), https://fortune.com/2019/03/08/mckinsey- staff-letter-kevin-sneader/. The "arena" reference is to *Citizenship in a Republic*, the title of a speech delivered by Theodore Roosevelt, former President of the United States, on April 23, 1910: "It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doers of deeds could have done them better. The credit belongs to the man who is actually in the arena [here, by analogy, McKinsey; and the arena, opioid sales], whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the

13.     Weeks later, McKinsey announced that it is no longer working for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders working to combat the crisis," McKinsey stated.[9] In addition to its work for Purdue, McKinsey has performed work for "several other companies on opioids."[10]

14.     The law does not let McKinsey off so easily. Like any other entities that fueled the opioid epidemic, McKinsey is liable for its misconduct. McKinsey is liable for its successful efforts to increase OxyContin sales after Purdue's 2007 guilty plea for misbranding the drug. Indeed, McKinsey's *mandate* was to increase the sales of the drug *in light of the fact* that Purdue had plead guilty to misbranding. McKinsey's task was to thread the needle: to increase OxyContin sales *given the strictures imposed by the 5-year CIA*. This McKinsey did, "turbocharging" (to use McKinsey's term) the sales of a drug it knew fully well was addictive and deadly.

15.     Because of Defendant's misconduct, Plaintiff Kitsap County and other counties and cities in Washington State are experiencing a severe public health crisis and have suffered significant economic damages, including but not limited to increased costs related to public health, opioid-related crimes and emergencies, the counties' and cities' own self-insured health care, criminal justice, and public safety. Kitsap County, like other counties and cities in Washington, has incurred substantial costs in responding to the crisis and will continue to do so in the future. As described in more detail below, these increased costs directly impact nearly

---

triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat."

[9] *See* Paul R. La Monica, *Consulting Firm McKinsey No Longer Working With Opioid Maker Purdue Pharma*, CNN Bus. (updated May 24, 2019, 2:33 PM), https://edition.cnn.com/2019/05/24/business/mckinsey-purdue-pharma-oxycontin/index.html. The statement was attributed to McKinsey as an entity. No individual's name was cited.

[10] *See* Drew Armstrong, *McKinsey No Longer Consulting for Purdue, Ends Opioid Work*, Bloomberg (updated May 23, 2019, 6:09 PM), https://www.bloomberg.com/news/articles/2019-05-24/mckinsey-no-longer-working-with-purdue-halts-opioid-consulting. While Plaintiff is aware of work McKinsey has performed for other opioid manufacturers, this Complaint concerns McKinsey's work with Purdue.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

every department in Kitsap County and amount to tens of millions of dollars by even the most conservative estimates.

16.     The State of Washington recently reached a settlement with McKinsey related to McKinsey's role in causing the opioid crisis. The state did not settle claims on behalf of Washington counties and cities and expressly did not release claims of Washington counties and cities.

17.     Accordingly, Kitsap County brings this action on behalf of itself and similarly situated counties and cities in Washington State ("the Class") to hold McKinsey liable for its role in helping Purdue circumvent the CIA and further fuel the opioid epidemic. McKinsey's conduct (i) violates the Washington Consumer Protection Act ("CPA"), RCW 19.86, *et seq.*, (ii) constitutes a public nuisance under Washington law, (iii) constitutes negligence and gross negligence under Washington law, (iv) has unjustly enriched McKinsey, and (v) violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*

## II.     PARTIES

### Plaintiff

18.     Plaintiff Kitsap County ("Plaintiff" or "Kitsap County" or "County") is a Washington County organized and existing under the laws of the State of Washington, RCW 36.01 *et seq.*

### Defendants

19.     Defendant McKinsey & Company, Inc., United States ("McKinsey US") is a corporation organized under the laws of the state of Delaware with its principal place of business located at 711 Third Avenue, New York, New York 10017.

20.     Defendant McKinsey & Company, Inc. ("McKinsey Inc.") is a corporation organized under the laws of the state of Delaware with its principal place of business located at 711 Third Avenue, New York, New York 10017.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

21.     McKinsey US and McKinsey Inc. are referred to in this Complaint together as "McKinsey" or "Defendant." McKinsey is a management consulting firm founded by James O. McKinsey in 1926. McKinsey today has over 30,000 employees and operates in more than 65 countries.

### III.     JURISDICTION AND VENUE

22.     This Court has federal question subject matter jurisdiction arising out of Plaintiff's RICO claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1961, *et seq*. and has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 (exclusive of interest and costs), the number of the members of the Class exceeds 100, and at least one member of the putative Class is a citizen of a state different from that of one of the defendants.

23.     This Court has personal jurisdiction over McKinsey under the Constitution of the United States because it conducts business in Washington, purposefully directs or directed its actions toward Washington, and/or has the requisite minimum contacts with Washington necessary to permit the Court to exercise jurisdiction. This Court also has personal jurisdiction over McKinsey because Plaintiff's claims arise out of, or relate to, McKinsey's contacts with the State of Washington.

24.     At all times relevant hereto, McKinsey engaged in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, that were intended to be, and were, implemented in, or whose implementation had a substantial and intended effect in, Kitsap County, among other places.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

COMPLAINT—CLASS ACTION - 7
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## IV.    FACTUAL ALLEGATIONS

26.    This lawsuit concerns McKinsey's work for Purdue and its owner, the Sackler family, beginning at least as early as 2004, and in particular McKinsey's work in the years after the 2007 guilty plea relating to Purdue's sales and marketing strategy for its opioids.

27.    McKinsey had an ongoing relationship with Purdue beginning at least as early as 2004 and lasting decades. By June 2009 McKinsey was advising Purdue on precisely the same sales and marketing strategy and practices for OxyContin that were the subject of the CIA. McKinsey continued this work after the expiration of the CIA and at least through November of 2017.

**A.    McKinsey's Business Model: "Consulting Is More Than Giving Advice."**

28.    Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range of activities, and the many firms and their members often define these practices quite differently."[11]

29.    Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant would provide a plan to the client that the client may choose to adopt or not.

30.    "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute on the plan.

---

[11] Arthur N. Turner, *Consulting Is More Than Giving Advice*, Harv. Bus. Rev. (Sept. 1982), https://hbr.org/1982/09/consulting-is-more-than-giving-advice.

COMPLAINT—CLASS ACTION - 8
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

31.     In his 1982 Harvard Business Review article entitled "*Consulting Is More Than Giving Advice*," Professor Arthur N. Turner of the Harvard Business School described the then-current state of the consulting industry's attitude toward implementation work: "The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus exceeds consulting's legitimate bounds. Others believe that those who regard implementation solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job."[12]

32.     A core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[13]

33.     Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the overall suite of services that McKinsey provided within the "transformational relationship" McKinsey developed with its clients.[14]

34.     Describing McKinsey's approach to implementation, one McKinsey Implementation Leader stated: "In some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we're working that cohesively together."[15]

---

[12] *Id.*

[13] McDonald, *supra* note 5, at p. 308.

[14] For McKinsey's own description of its implementation services, *see Implementation*, McKinsey Accelerate, https://www.mckinsey.com/business-functions/mckinsey-accelerate/how-we-help-clients/implementation (last visited Feb. 18, 2021).

[15] *McKinsey on Implementation*, YouTube (Apr. 30, 2017), https://www.youtube.com/watch?v=rEQOGVpl9CY.

COMPLAINT—CLASS ACTION - 9
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

35.     Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[16]

36.     To put it simply, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once the objective is identified, the client and McKinsey then engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve those objectives for the client.

37.     As detailed below, after McKinsey provided advice to Purdue, McKinsey remained with Purdue to assure proper implementation of McKinsey's strategies to maximize OxyContin sales.

**B.      Purdue Pleaded Guilty to Misbranding OxyContin and Was Bound by a CIA.**

38.     Purdue is the manufacturer of OxyContin, among other opioids. OxyContin is a Schedule II opioid agonist[17] tablet of pure oxycodone first approved in 1995 and the product whose launch in 1996 ushered in the modern opioid epidemic. Purdue initially made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, 80 mg, and 160 mg. The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets delivered sixteen times that. OxyContin is currently indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

39.     Purdue is owned by members of the Sackler family and was for many years led by its Board Director and former President, Dr. Richard Sackler. Richard Sackler had grand

---

[16] *Id.*

[17] An opioid agonist is a drug that activates certain opioid receptors in the brain. An antagonist, by contrast, blocks the receptor and can also be used in pain relief or to counter the effect of an opioid overdose.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

ambitions for the company; according to a long-time Purdue sales representative, "Richard really wanted Purdue to be big—I mean *really* big."[18]

40.    On May 10, 2007, the Purdue Frederick Company, Purdue's parent, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.*

41.    Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."[19]

42.    Concurrent with the guilty plea by the Purdue Frederick Company, Purdue entered into a CIA with the Office of Inspector General of HHS on May 7, 2007.[20]

43.    Purdue's compliance obligations under the CIA ran for a period of five years, expiring on May 10, 2012.[21]

44.    Pursuant to the CIA, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin. Purdue was further obligated to implement written policies regarding its compliance program and its compliance with federal health care program and United States Food and Drug Administration ("FDA") requirements, including:

> "selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate . . . including, but not limited to, information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;
>
> compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;

---

[18] Christopher Glazek, *The Secretive Family Making Billions from the Opioid Crisis*, Esquire (Oct. 16, 2017), http://www.esquire.com/news-politics/a12775932/sackler-family-oxycontin/.
[19] Information at pp. 5-6, *United States v. Purdue Frederick Co.*, No. 1:07-cr-00029-JPJ (W.D. Va. May 10, 2007), Dkt. # 5.
[20] CIA (*supra* note 2).
[21] *Id.* at p. 1.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

. . .

the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products," including "the form and content of Materials disseminated by sales representatives; and the internal review process for the Materials and information disseminated by sales representatives."[22]

45.     Purdue also was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the CIA, and to file compliance reports on an annual basis with the inspector general.[23]

## C.     Purdue Hired McKinsey to Boost Opioid Sales Despite the CIA.

46.     The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of board seats. To advise the board of directors of Purdue was to advise the Sackler family. The interests of the Sackler family and the Purdue board of directors, and Purdue itself, as a privately held company, are all aligned. Practically, they are indistinguishable.[24]

### 1.     The Sacklers Distanced Themselves from Purdue.

47.     After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business. On April 18, 2008, Richard Sackler, then the co-chairman of the board of directors along with his uncle, communicated to other family members that Purdue's business of selling OxyContin and other opioids was a "dangerous concentration of risk." Richard Sackler recommended a strategy of installing a loyal CEO of Purdue who would safeguard the interests

---

[22] *Id.* at pp. 7, 8-9.
[23] *Id.* at pp. 14, 23.
[24] Craig Landau ("Landau"), soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.

of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales.

48.     In the event that a purchaser for Purdue could not be found, Richard Sackler stated Purdue should "distribute more free cash flow" to the Sacklers. Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin. In the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible: $300 million. That amount was required to be retained by Purdue pursuant to a partnership agreement with separate company. Otherwise, all the money was distributed to the owners.[25]

49.     Concurrently, the Sacklers backed away from day-to-day jobs at Purdue. During the ongoing investigation that resulted in the 2007 guilty plea, "several family members who worked at Purdue stepped back from their operational roles."[26] In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler chose to exit their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president. They remained on the board of directors, however.

50.     Consistent with the advice of Richard Sackler, the Sacklers appointed John Stewart ("Stewart") as the CEO of Purdue in 2007. The Sacklers viewed Stewart as someone loyal to the family. He had previously worked for a division of Purdue in Canada. Stewart's job was to assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue. Stewart was paid more than $25 million for his services to Purdue from 2007 through 2013.

51.     At the time Richard Sackler communicated these plans to distance the family from Purdue, the Sacklers had already established a second company, Rhodes Pharmaceuticals

---

[25] *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, Wall St. J. (updated June 30, 2019, 6:15 PM), https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120.

[26] Barry Meier, *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic* at p. 167 (2018).

COMPLAINT—CLASS ACTION - 13
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

L.P. ("Rhodes"). The Sacklers established Rhodes *four months* after the 2007 guilty plea.[27] Rhodes' purpose was to sell generic versions of opioids. It was, in other words, a way for the Sacklers to continue to make money off of opioids while separating themselves from Purdue. By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled 1.7% of the overall opioid market. When combined with Rhodes, however, the Sacklers' share of the overall opioid market was approximately 6% of all opioids sold in the United States.[28]

> ### 2. Purdue Hired McKinsey to Devise and Implement an OxyContin Sales Strategy Consistent with the Sacklers' Goals.

52. The Sacklers faced a problem: either option they were pursing—a sale or significant distributions to shareholders—would require Purdue to increase profitability in the short term. This meant they needed to grow OxyContin sales as dramatically as possible while at the same time appearing to comply with the CIA.[29]

53. Purdue and the Sacklers were well aware of the constraints posed by the CIA. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to whether Purdue should have a single sales force marketing all Purdue products, including OxyContin, or instead to "create a separate Sales Force for Intermezzo [a sleeping pill]—that would be comprised of approximately 300 representatives." Stewart, the Sacklers' chosen CEO, saw an opportunity, and asked if the CIA would apply if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another narcotic painkiller), using the separate sales force. Stewart inquired whether the new drug launch might fall outside of the CIA.

---

[27] *Billionaire Sackler Family Owns Second Opioid Maker*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132.

[28] *Id.*

[29] As one Purdue executive stated of Purdue's attitude toward the CIA: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change—the way the sales force was managed and incentivized, everything stayed the same." David Crow, *How Purdue's 'One-Two' Punch Fuelled the Market for Opioids*, Fin. Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

54.     Bert Weinstein ("Weinstein"), Purdue's Vice President of Corporate Compliance, told Steward that the new drug launch would still be covered by the CIA.

55.     Given the tension between compliance with the CIA and the desire to sell more OxyContin, Purdue needed help.

56.     Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with its internal resources. That's the most classic way that McKinsey is brought in."[30]

57.     Such was the case with Purdue. Because it did not have the requisite expertise to address the problems posed by the CIA internally, Purdue hired McKinsey to devise a sales and marketing strategy to increase opioid sales in light of the CIA and growing concern about the "concentration of risk" that Purdue's business of selling opioids posed to its owners.

58.     In short, Purdue would pay money to McKinsey in exchange for McKinsey telling the company how to sell as much OxyContin as possible so that the Sacklers could obtain cash to diversify their investment holdings away from Purdue.

59.     Purdue's Executive Committee discussed CEO Stewart's concerns regarding the constraints posed by the CIA on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

60.     Stewart, as CEO, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey and required his personal approval for any work orders with McKinsey.

61.     In addition, Weinstein, who was "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in th[e] CIA,"[31] reported directly to Stewart.

---

[30] *How McKinsey Became One of the Most Powerful Companies in the World*, YouTube (June 6, 2019), https://www.youtube.com/watch?v=BBmmMj_maII.
[31] CIA (*supra* note 2) at p. 4.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

62.     Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

63.     McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia ("Gasdia"), Vice President of Sales and Marketing.

64.     From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate their sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the **_creation_** of an OxyContin sales strategy, but also its **_implementation_**.

**D.     Purdue Relied on McKinsey.**

65.     McKinsey is not hired to give casual advice. They are a corporate mandarin elite, likened to the Marines or the Jesuits.[32] United States Senator Mitt Romney, during his presidential campaign in 2012, told the editorial board of the Wall Street Journal that as president he would approach reducing the size of the government by hiring McKinsey. A former consultant himself, Romney stated, "[s]o I would have . . . at least some structure that McKinsey would guide me to put in place." In response to audience surprise, Romney said, "I'm not kidding. I would probably bring in McKinsey."[33]

66.     McKinsey is not cheap, either. A client does not choose to pay McKinsey unless it expects to receive advice it could not have obtained within its own organization. McKinsey offers solutions to clients facing challenges they feel they cannot adequately address on their own. In 2008, McKinsey's revenue was $6 billion.

---

[32] Said one former McKinsey partner to Business Week in 1986: "There are only three great institutions left in the world: The Marines, the Catholic Church, and McKinsey." McDonald, *supra* note 5, at p. 165.
[33] *Id.* at p. 1.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

67.    McKinsey has long touted the notion of the "transformational relationship." It is the goal of every client relationship McKinsey develops, and, McKinsey argues, the best way to extract value from a client's use of McKinsey's services.

68.    At its core, the "transformational relationship" is *long-term*. It is the antithesis of a one-off contract wherein McKinsey performs one discreet project for a client and then concludes its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[34] The long-term result can be "dependence" on the McKinsey consultants.

69.    This strategy of insinuating itself into all aspects of its clients' business proved enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a steady and growing flow of billings for years if not decades. In 2002, for example, Business Week noted that at that moment, the firm had served four hundred clients for fifteen years or more.[35]

70.    Purdue was no different. McKinsey counted Purdue as a client at least as early as 2004. The precise duration of the relationship between McKinsey and Purdue and its owners has not been ascertained, although it is known that McKinsey worked with Purdue for years before Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007, and that by June 2009 McKinsey was actively working with Purdue to increase OxyContin sales in light of that guilty plea and its accompanying CIA. The work continued through at least 2018.

---

[34] *Id.* at p. 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies (REMS) for OxyContin required by the FDA, McKinsey partner Maria Gordian ("Gordian") wrote to fellow partners Martin Elling ("Elling") and Rob Rosiello ("Rosiello") regarding progress in the "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue board members Jonathan Sackler and Peter Boer "basically 'blessed' [Landau] to do whatever he thinks is necessary to 'save the business.'. . . *I believe there is a good opportunity to get another project here."* (emphasis added). Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy work" for another decade.

[35] *Id.* at p. 136.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

71. McKinsey partner Gordian, in her March 26, 2009 "EY2009 Impact Summary" internal memorandum to McKinsey Director Olivier Hamoir and McKinsey's Personnel Committee Manager Kristine Lavik, recounted her accomplishments that year on the Purdue account. The document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of firm's relationship for Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family and serving them on key business development issues, and to expanding our relationship with [John] Stewart and other members of the senior management team.

72. McKinsey staffed at least thirty-six known consultants to Purdue, from senior partners all the way down through engagement managers to entry-level associates. Throughout the unfolding of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea, McKinsey remained steadfast alongside the Sacklers and Purdue every step of the way. The *mea culpas* would come only later.

**E.   McKinsey Developed a Granular Strategy for Purdue.**

73. By 2009, McKinsey was working with its long-time client to craft and implement a sales and marketing plan to increase OxyContin sales despite the CIA and the diminishing outlook for Purdue.

74. In June 2009, McKinsey advised Purdue senior management, including Landau, then the Chief Medical Officer ("CMO") and future CEO, regarding a variety of strategies to increase Purdue's opioid sales that were developed using McKinsey's expertise and proprietary approaches to problem solving.

**1.   Granular Growth.**

75. McKinsey prides itself on certain managerial techniques it professes to have detailed knowledge of and expertise in deploying. These techniques are generally applicable to

problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

76.    After the first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers to its clients is to tell them how to grow.

77.    In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach to identifying which subsets of the client's existing business are the sources of growth and exploiting them for all they are worth. In August 2008, McKinsey Directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: *The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance*. "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[36]

78.    In an article in the McKinsey Quarterly published the same month that Purdue pled guilty, the authors explained:

> Our research on the revenue growth of large companies suggest that executives should "de-average" their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[37]

79.    Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[38]

---

[36] Book Excerpt: *The Granularity of Growth*, McKinsey & Co. (Mar. 1, 2008), https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth.

[37] Mehrdad Baghai et al., *The Granularity of Growth*, McKinsey Q. (May 1, 2007), https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth.

[38] *Id.*

COMPLAINT—CLASS ACTION - 19
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

## 2.    "Identifying Granular Growth Opportunities for OxyContin."

80.    In June of 2012, Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."

81.    McKinsey performed this assignment in excruciatingly granular detail, analyzing each sales channel for Purdue's opioids for weaknesses and opportunities. For instance, McKinsey informed the Sacklers that "[d]eep examination of Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by 18% . . . . Further, the Walgreens data also shows significant impact on higher OxyContin dosages." In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers. In addition, McKinsey suggested the use of opioid savings cards distributed in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids despite Walgreens actions.

82.    The themes of McKinsey's work would be crystallized in a series of presentations and updates made to the Sackler family and Purdue's board of directors in the summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

### a.    Marketing — Countering Emotional Messages

83.    From the outset of McKinsey's known work for Purdue, the work was grim. In June of 2009, McKinsey teamed with Purdue's CMO (and current CEO) Landau and his staff to discuss how best to "counter the emotional messages from mothers with teenagers that overdosed in [sic] OxyContin."

84.    Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

85.    These marketing claims were tailored to avoid any pitfalls that the CIA might hold. While nonetheless false and misleading, these claims regarding "freedom" and "peace of

COMPLAINT—CLASS ACTION - 20
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1  mind" of OxyContin users were narrowly tailored in order to avoid representations regarding

2  "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified

3  in Section III.B.2.c of the CIA.[39]

4       86.    Purdue's marketing materials from that time period are illustrative of the

5  approach:[40]



17      87.    In addition, McKinsey suggested the tactic of "patient pushback," wherein

18  McKinsey and Purdue would foment *patients* to directly lobby their doctors for OxyContin when

19  those physicians expressed reservations regarding the administration of Purdue's opioids.

20            **b.    Targeting — Selling More OxyContin to Existing High Prescribers**

21      88.    Perhaps the key insight McKinsey provided was, using its granular approach, to

22  identify historically large prescribers and target them with ever more sales and marketing

23  resources.

24

25  _____

26  [39] CIA (*supra* note 2) at p. 7.
   [40] JWelcome, *Court Documents Show How OxyContin's Sales Team Pushed "Hope in a Bottle"*, NewsmakersLive
   (July 19, 2018), http://newsmakerslive.com/court-documents-show-how-oxycontins-sales-team-pushed-hope-in-a-bottle/.

COMPLAINT—CLASS ACTION - 21
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

89.     On January 20, 2010, Purdue's board of directors was informed of the ongoing work McKinsey was performing concerning a new "physician segmentation" initiative whereby McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those that had historically been the highest prescribers. McKinsey then worked with Purdue's sales and marketing staff to specifically target those prescribers with a marketing blitz to encourage even further prescribing.

90.     Purdue trained its sales force in tactics to market to these high prescribers based on McKinsey's insights and designed in conjunction with McKinsey.

91.     Many of the historically highest prescribers of OxyContin—those same individuals that McKinsey urged Purdue to target—had prescribed Purdue's OxyContin *before* the 2007 guilty plea, and had already been subjected to Purdue's misrepresentations regarding OxyContin that were the subject of that guilty plea.

92.     McKinsey identified these physicians—those that had already been influenced by Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a massive marketing push to sell more OxyContin.

93.     McKinsey worked closely with Purdue over many years to continually refine this approach and required increasingly granular data for its analysis. More than three years after the introduction of the physician segmentation initiative, McKinsey requested, and Purdue provided, "prescriber-level milligram dosing data" so it could further analyze the amounts of OxyContin prescribed by individual physicians.

94.     At the same time, McKinsey urged the Sacklers to strictly manage the target lists of each sales representative to assure that the maximum amount of each sales representative's time was spent with the most attractive customers.

95.     On July 23, 2013, Purdue's board of directors discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline in "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."

96.     McKinsey told Purdue and the Sacklers that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers, and urged Purdue and the Sacklers to "make[] a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.

97.     McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write.

98.     By November 2013, McKinsey had obtained the physician-level data they had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them. The Purdue board of directors was kept apprised of McKinsey's progress.

### c.     Titration — Selling Higher Doses of OxyContin

99.     McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction, and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

100.     Consistent with its granular growth analysis, as early as October 26, 2010 McKinsey advised the Sacklers and the Purdue board of directors that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.

101.     McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013, that Purdue had identified weakness in prescribing rates among the higher doses of

OxyContin, and reassured the Sacklers that "McKinsey would analyze the data down to the level of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

102.    Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose," and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.

### d.    Covered Persons — Sales Quotas and Incentive Compensation

103.    McKinsey urged the use of quotas and bonus payments to motivate the sales force to sell as many OxyContin prescriptions as possible.

104.    Notably, this behavior was contemplated by the CIA, which required Purdue to implement written policies regarding "compensation (including salaries and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives *do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products*."[41]

105.    By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy, to dramatically increase the quota of annual sales visits that Purdue sales representatives were required to make to prescribers. The quota was 545,000 visits in 2010; 712,000 visits in 2011; 752,000 visits in 2012; and 744,000 visits in 2013.

106.    On August 8, 2013, as part of their "Identifying Granular Growth Opportunities for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal (e.g., $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO and Board."

107.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to the Purdue board of directors in July 2013, McKinsey nonetheless urged Purdue, in addition to

---

[41] CIA (*supra* note 2) at p. 7 (emphasis added).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

increasing the focus of the sales force on top prescribers, to also increase the overall quotas for

sales visits for each sales representative from 1,400 to up to 1,700 annually.

108.    In 2013, McKinsey identified one way that Purdue could squeeze more

productivity out of its sales force: by slashing *one third* of the time Purdue devoted to training its

sales force (from 17.5 days per year to 11.5 days):



| One possible way to attain benchmark ~1500 calls per year is to **decrease training days by ~6 days and increase calls per day by 5%** | | One possible route to benchmark |

| Current call activity | | Potential new allocation | |
| Number of "on territory" days per year | | Number of "on territory" days per year | |
| Item | Days¹ | Item | Days¹ |
| Number of working days | 260 | Number of working days | 260 |
| Holidays | -11.3 | Holidays | -11.3 |
| Vacation and other time off | -27.2 | Vacation and other time off | -27.2 |
| Trainings and meetings | -17.5 | Trainings and meetings | -11.5 |
| Other company-related time off of field | -4.3 | Other company-related time off of field | -4.3 |
| Total days | 199.7 | Total days | 205.7 |
| Avg calls per day | x    7 | Avg calls per day | x    7.35 |
| Total calls per year | 1398 | Total calls per year | 1512 |

1 Purdue 2012 Actual data was used for this analysis.

SOURCE: Purdue; team analysis                                    McKinsey & Company | 89

109.    By eliminating one third of the time sales representatives were required to be in

training, McKinsey projected that Purdue could squeeze an additional 5% of calls per day out of

its newly less-trained sales force.

110.    Additionally, McKinsey advised Purdue on how to craft incentive compensation

for the sales representatives, who were Covered Persons pursuant to the CIA.[42] McKinsey knew

that, combined with the strictures of sales quotas and less training for the sales force,

bonus/incentive compensation to the sales representatives based on the number of OxyContin

prescriptions the representative produced could be a powerful driver of incremental OxyContin

sales.

[42] CIA (*supra* note 2) at p. 2.

1

2

      **e.**    **Increasing the Overall Size of the Opioid Market: The Larger the Pie, the Larger the Slice**

3

4       111.    Consistent with McKinsey's mandate, Purdue incentivized its sales staff "to

5  increase not just sales of OxyContin but also generic versions of extended release oxycodone."[43]

6  Typically, one would not wish to encourage the sales of generic competitors that offer a similar

7  product to one's own. If, however, the goal is to position a company to look like an attractive

8  acquisition target, the growth of the overall opioid market is just as important as one's own

9  market share: "Whereas pharma salespeople are usually compensated based on their ability to

10  grow sales of a particular medicine, part of the bonus for Purdue's staff was calculated in relation

    to the size of the overall market[.]"[44]

11       112.    Notably, this notion that the size of a company's market share is not as important

12  as the size of the ***overall*** market in which it competes is a core insight of McKinsey's granular

13  approach to identifying corporate growth opportunities. Describing their authors' conclusions in

14  *The Granularity of Growth*, McKinsey stated, "[o]ne of their most surprising conclusions is that

15  increased market-share is seldom a driver of growth. They contend, instead, that growth is driven

16  by where a company chooses to compete: which market segments it participates in . . . . The key

17  is to focus on granularity, to breakdown big-picture strategy into its smallest relevant

18  components."[45]

19       113.    In other words, "Purdue's marketing force was indirectly supporting sales of

20  millions of pills marketed by rival companies." "It's the equivalent of asking a McDonald's store

21  manager to grow sales of Burger King and KFC," stated a government official with the HHS.[46]

22  McKinsey designed this plan.[47]

23  _____

24  [43] Crow, *supra* note 29.
    [44] *Id.*
    [45] Book Excerpt, *supra* note 36.
25  [46] Crow, *supra* note 29.
26  [47] It is worth noting that this strategy of increasing overall opioid sales directly benefitted the Sacklers through their
    ownership of Rhodes. *See supra* ¶ 51. Especially worth noting is that this strategy also benefitted McKinsey's
    other opioid clients, such as Johnson & Johnson. *See infra* ¶ 152. "They have a huge amount of inside information,
    which raises serious conflict issues at multiple levels," stated a former consultant, referring to McKinsey's

COMPLAINT—CLASS ACTION - 26
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**F.      The Transformation: McKinsey Worked with Purdue to Implement its Strategies**

114.     As early as September 11, 2009, McKinsey told Purdue that it could generate $200 million to $400 million in additional annual sales of OxyContin by implementing McKinsey's strategy based on the opportunities its granular growth analysis had identified. McKinsey reiterated its assurances regarding the hundreds of millions of dollars of additional OxyContin sales on January 20, 2010.

115.     Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

116.     For instance, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. The initiative sought to identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe ever more OxyContin, in higher doses, for longer times, to ever more patients.

117.     On January 20, 2010, the Purdue board of directors was informed of the progress in implementing McKinsey's "physician segmentation" initiative.

118.     This collaboration would continue over the course of the relationship between Purdue and McKinsey.

119.     During the time that McKinsey was advising Purdue, Purdue deliberately minimized the importance of the CIA. In 2008, Carol Panara joined the Purdue sales force from rival Novartis. She would stay with the company until 2013, during which time McKinsey was

---

influential role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, Institutional Inv. (July 8, 2019), https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-Written. For example, in an August 15, 2013 presentation to Purdue management entitled "Identifying OxyContin Growth Opportunities," McKinsey noted that "McKinsey's knowledge *of the ways other pharma companies operate* suggests Purdue should reassess the roles of MSL and HECON Groups - and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).

responsible for increasing OxyContin sales at Purdue, and culminating with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

120.    Ms. Panara stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, '[w]e were sued, they accused us of mis-marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine' . . . . You had the impression they were portraying it as a bit of a witch hunt."[48] (Purdue and its executives paid $634.5 million in fines.)

121.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to sell OxyContin to doctors while at the same time maintaining technical compliance with the CIA: Ms. Panara stated that, though she was told she could not flatly claim that OxyContin was better or safer than other opioids, "she was trained to talk about products in ways that implied that it was safer." She might tout OxyContin's 12-hour formulation to a prescriber. "You could say that with a shorter-acting medication that wears off after six hours, there was a greater chance the patient was going to jump their dosing schedule and take an extra one a little earlier . . . . We couldn't say [it was safer], but I remember we were told that doctors are smart people, they're not stupid, they'll understand, they can read between the lines."[49]

## G.    Project Turbocharge.

122.    In 2013, the year after the CIA expired, McKinsey urged a number of transformational sales and marketing tactics that would further boost OxyContin sales. McKinsey described these tactics to the Purdue board of directors in a series of updates entitled "Identifying Granular Growth Opportunities for OxyContin" in July and August of 2013.

123.    McKinsey dubbed their overall sales and marketing strategy for Purdue "Project Turbocharge," and urged the Sackler family and the board of directors to adopt it. Specifically, McKinsey urged the board of directors to "make[] a clear go-no go decision to 'Turbocharge the Sales Engine.'"

---

[48] Crow, *supra* note 29.
[49] *Id.* (alteration in original).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

124. McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

125. The Sacklers were impressed with McKinsey's work. On August 15, 2013, Richard Sackler emailed Mortimer D.A. Sackler, "the discoveries of McKinsey are astonishing."

126. Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family—not the Purdue board of directors—in order to pitch Project Turbocharge. Dr. Arnab Ghatak ("Ghatak"), one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow partner Elling in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] . . . We went through exhibit by exhibit for about 2 hrs . . . They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."

127. Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"

128. As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and rebranded the initiative as "E2E: Evolve to Excellence."[50]

129. Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

---

[50] Regarding the name change, CEO Stewart wrote to McKinsey partners Rosiello and Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive `turbocharge` process — *though we do need to find a better and more permanently appropriate name.*" (emphasis added).

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

130.    CEO Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive `turbocharge' process," referring to McKinsey's plan.

131.    After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Gasdia during Purdue's implementation of McKinsey's recommendations.

132.    In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

133.    At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board of directors discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

134.    McKinsey's Project Turbocharge, now re-named Evolve to Excellence, called for a ***doubling*** of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's influence on Purdue's operations after the 2007 guilty plea is stark:



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3000
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

135.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project Turbocharge had been implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million per quarter, an increase of ***800%***.

136.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On January 17, 2014, new CEO Mark Timney ("Timney") received reports from McKinsey emphasizing that, in order to increase profits, Purdue must again increase the number of sales visits to "high-value" prescribers, i.e., those that prescribe the most OxyContin.[51]

137.    McKinsey also urged, consistent with their granular approach, that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue product. Previously, the split had been fifty-fifty.

138.    Purdue implemented McKinsey's suggestion.

**H.    McKinsey's Efforts Triple OxyContin Sales.**

139.    Purdue got what it wanted out of McKinsey. Between 2008 and 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone.

140.    These distributions would not have been possible without McKinsey's work dramatically increasing OxyContin sales.

141.    The Sacklers were aware of the value McKinsey provided: on December 2, 2013, CEO Stewart informed Kathe Sackler and Purdue Vice President of Sales and Marketing Gasdia that Project Turbocharge "was already increasing prescriptions and revenue." These results were

---

[51] In fact, recent deposition testimony suggests McKinsey may have even been responsible for the fact that Timney was given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony:

    Q:    Are you familiar with McKinsey & Company?
    A:    I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.
    Q:    Did individuals at McKinsey ***assist you in getting hired as the CEO*** of Purdue?
    A:    I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding. (emphasis added).

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

already being realized **before** the strategy was fully deployed as the theme of the 2014 National Sales Meeting.

142. McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined: the Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of HHS entered into a CIA whereby Purdue was monitored to assure that those sales did not continue.

143. In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[52]

144. The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a **tripling** of revenue from OxyContin sales.[53]

145. Under McKinsey's guidance, OxyContin would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[54] That OxyContin sales peaked in 2013 is especially notable, given that **overall** opioid prescriptions had **already peaked** three years earlier, in 2010.[55] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

146. By 2018, with OxyContin sales in their inexorable decline, Purdue announced that it would cease sending sales representatives to healthcare providers to promote OxyContin. The ranks of sales representatives were cut back to 200 people—the approximate size of Purdue's sales staff prior to the initial launch of OxyContin.

---

[52] Crow, *supra* note 29.
[53] *Id.*
[54] Phil McCausland & Tracy Connor, *OxyContin Maker Purdue to Stop Promoting Opioids in Light of Epidemic*, NBC News (updated Feb. 10, 2018, 4:53 PM), https://www.nbcnews.com/storyline/americas-heroinepidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.
[55] Gery P. Guy Jr. et al., *Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006 – 2015*, Morbidity & Mortality Wkly. Rep. (July 7, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm.

147.    In 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than 60 milligrams per day.

## I.    McKinsey Acted to Maximize OxyContin Prescriptions Despite Knowing About the Dangers of Opioids.

148.    McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2003, when McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson ("Pearson"). Pearson worked for McKinsey for 23 years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing McKinsey in 2008 to helm Valeant Pharmaceuticals.[56]

149.    Pearson stated, "[a]t McKinsey pharmaceuticals was one of our biggest industry groups."[57] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp elbowed.'"[58]

150.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

---

[56] John Gapper, *McKinsey's Fingerprints Are All Over Valeant*, Fin. Times (Mar. 23, 2016), https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a. Notably, Rosiello, a McKinsey partner who was a co-lead of the Purdue account, went on to join Pearson at Valeant Pharmaceuticals in 2015 as Chief Financial Officer.

[57] Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*, Institutional Inv. (Sept. 3, 2014), https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry#:~:text=cookies%20click%20proceed.-,Mike%20Pearson's%20New%20Prescription%20for%20the%20Pharmaceuticals%20Industry,on%20acquisitions%20than%20on%20R%26D.

[58] Gapper, *supra* note 56.

COMPLAINT—CLASS ACTION - 33
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

151.    In 2012, while advising Purdue, McKinsey described its health care capabilities as follows: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

152.    By the time McKinsey was working with Purdue on sales and marketing in 2009, it already had extensive experience with opioids in particular. As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs. For example, on March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson regarding how to market their opioid Duragesic. Incredibly, one of the recommendations McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing efforts on doctors that were *already* prescribing large amounts of Purdue's OxyContin.[59]

153.    As early as 2002 McKinsey had such intricate knowledge of the sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with OxyContin, specifically, that it was able to recommend to *a competitor of Purdue* that it boost its own opioid sales by *following in the footsteps of Purdue.*

154.    Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, although the full scale of the opioid epidemic was not yet clear, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

155.    In February 2009, Dr. Art Van Zee, in his peer-reviewed article in the American Journal of Public Health entitled "*The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*," stated the matter plainly: "*Compared with noncontrolled*

---

[59] Chris McGreal, *Johnson & Johnson Faces Multibillion Opioids Lawsuit That Could Upend Big Pharma*, Guardian (June 23, 2019, 2:00 AM), https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial.

*drugs, controlled drugs, with their potential for abuse and diversion, pose different public health risks when they are overpromoted and highly prescribed.*"[60] "By 2004, OxyContin had become the most prevalent prescription opioid abused in the United States."[61]

156.    Further, Dr. Van Zee identified the ***precise tactics*** that McKinsey deployed for Purdue as a source of OxyContin misuse and abuse, and suggested that regulation may be appropriate to curtail its use: "The use of prescriber profiling data to target high-opioid prescribers—coupled with very lucrative incentives for sales representatives—would seem to fuel increased prescribing by some physicians—perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."[62]

157.    Indeed, one reason that ***Purdue*** had knowledge that their own products were addictive and dangerous is because McKinsey told them. On September 13, 2013 McKinsey briefed Purdue on the ongoing concerns regarding OxyContin addiction and diversion among prescribers:



---

[60] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99 Am. J. Pub. Health 221, at pp. 221, 225 (Feb. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf (emphasis added).

[61] *Id.* at p. 224.

[62] *Id.* at p. 225.

158.    In a PowerPoint slide entitled "Findings on messaging and positioning," part of a presentation to Purdue entitled "OxyContin growth opportunities: Phase 1 Final Report: Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most physicians do not feel that [OxyContin] reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

159.    Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

160.    McKinsey's work further demonstrates its knowledge of the severity of the opioid crisis. In June 2009, McKinsey's work included "countering the emotional messages from mothers with teenagers that overdosed on OxyContin." Indeed, McKinsey's mandate was to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the ***overprescribing of opioids*** and the inevitable consequences thereof.

161.    Another indication that OxyContin sales should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase product liability insurance to cover its practice of selling OxyContin.

162.    Marvin Bower ("Bower"), a founding father of McKinsey and managing director of the firm from 1950 to 1967, instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver bad news if you must, but deliver it properly."[63]

163.    McKinsey's work with Purdue, which began just after his death in 2003, would have been unrecognizable to Bower, one of the founders of modern management consulting. Instead of acknowledging the elephant in the room—that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States—and

---

[63] McDonald, *supra* note 5 at p. 35.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

delivering that bad news properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales, the torpedoes be damned.

164.    On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

165.    Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board of directors. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: McKinsey proposed that Purdue pay health insurers or other entities in the distribution chain rebates "for every OxyContin overdose attributable to pills they sold."[64]

166.    Once again, in perfect McKinsey parlance, these payments for future OxyContin overdoses were christened "Event-Based contracts":



---

[64] Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, N.Y. Times (updated Dec. 17, 2020), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html?name=styln-opioid&region=TOP_BANNER&block=storyline_menu_recirc&action=click&pgtype=Article&impression_id=b745da80-69ce-11eb-ba7f-1321124f4232&variant=1_Show.

167.     Helpfully, McKinsey provided estimates for the future costs of these "events."[65] McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."

168.     A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs:



169.     The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

---

[65] McKinsey defined an "event" as "first occurrence for overdose or opioid use disorder."

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

```
Message
─────────────────────────────────────────────────────────────────────────────
From:      Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
           (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]
Sent:      7/4/2018 12:10:13 PM
To:        A G [drarnabghatak@gmail.com]
Subject:   Re: [EXT]Re: Howdy


Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for his role on the
>> Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
>> should be doing anything other than eliminating all our documents and emails.  Suspect not but as things
>> get tougher there someone might turn to us.  M
>>
>> +=============================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +=============================================================+
```

170.    It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of recommending "event-based contracts" to Purdue, Elling raised this concern with Ghatak and suggested corrective action: destroying evidence.

171.    Elling's prediction that things would "get tougher" for Purdue would prove prescient.

172.    A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition . . . . They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."[66]

**J.    Purdue's 2020 Guilty Plea and McKinsey's Recent Statement.**

173.    On October 20, 2020, Purdue once again agreed with the United States Department of Justice to plead guilty to improper marketing of OxyContin and other opioids. This time the plea agreement concerned conduct from 2010 to 2018, the period during which McKinsey was working closely with Purdue to implement McKinsey's strategy.

---

[66] Bogdanich & Forsythe, *supra* note 64.

174.    Purdue agreed to plead guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids – frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."[67]

175.    The new plea agreement does not identify Purdue's co-conspirators, and McKinsey is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting company."

176.    Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

177.    Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey]*, implemented many of [McKinsey's] recommendations." (emphasis added).

178.    Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO")." (emphasis added).

179.    On December 5, 2020, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued is response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

> As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.
>
> Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work

---

[67] Jan Hoffman & Katie Benner, *Purdue Pharma Pleads Guilty to Criminal Charges for Opioid Sales*, N.Y. Times (updated Dec. 17, 2020), https://www.nytimes.com/2020/10/21/health/purdue-opioids-criminal-charges.html.

sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.[68]

180.    In recent weeks, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

**K.    Impact of McKinsey and Purdue's Conduct.**

181.    McKinsey's method of aggressive marketing of opioids to prescribers has demonstrably exacerbated the opioid crisis. A recent Journal of American Medical Association study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[69]

182.    These dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge was implemented at Purdue.

183.    The study noted "[p]hysician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[70]

184.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing

---

[68] *McKinsey statement on its past work with Purdue Pharma*, McKinsey & Co. (Dec. 5, 2020), https://www.mckinsey.com/about-us/media/mckinsey-statement-on-its-past-work-with-purdue-pharma#.
[69] Scott E. Hadland et al., *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses*, 2 JAMA Network 1 (Jan. 18, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.
[70] *Id.* at p. 2.

COMPLAINT—CLASS ACTION - 41
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

rates; per capita, ***the number of marketing interactions with physicians demonstrated a stronger association with mortality*** than the dollar value of marketing."[71]

**L.    The Opioid Epidemic Caused by McKinsey and Purdue Has Directly Affected Kitsap County.**

185.    Kitsap County, located in western Washington State, has over 275,000 residents and is the seventh-largest county in the state.

186.    Much like the rest of the United States, Kitsap County has felt the profound consequences of the opioid epidemic. As a direct result of Defendants' aggressive marketing scheme and failure to stop the flood of prescription opioids, Kitsap County has suffered significant and ongoing harms—harms that will continue well into the future. Each day that Defendants continue to evade responsibility for the epidemic they caused, the County must continue allocating substantial resources to address it.

187.    Opioid use has reached crisis levels across the country, and Kitsap County is not immune to national trends. Statistics regarding opioid overdoses and treatment opioid-use disorder—while not capturing the whole story of this far-reaching epidemic—provide quantitative indicators of the extent of the crisis.

188.    In Kitsap County, the statistics show that, in recent years, the crisis has only grown. For example, between 2002-2004 and 2011-2013, the number of opioid-use treatment admissions rose 305%.[72] From 1999 to 2003, there were 62 opioid-related deaths in Kitsap County;[73] this grim count increased to 107 opioid-related deaths between 2012 and 2016.[74]

189.    According to data from the Prescription Monitoring Program and analyzed by the Washington State Department of Health, in the first quarter of 2015, the rate of patients with at

---

[71] *Id.* at p. 1 (emphasis added).

[72] *Opioid Trends Across Washington State*, U. of Wash. Alcohol & Drug Abuse Inst. (Apr. 2015) http://adai.uw.edu/pubs/infobriefs/ADAI-IB-2015-01.pdf

[73] *Washington State Drug Overdose Quarterly Report*, Wash. St. Dep't of Health, https://www.doh.wa.gov/DataandStatisticalReports/InjuryViolenceandPoisoning/InjuryData/WashingtonStateInjuryDataTables/OpioidQuarterlyReport (last visited Oct. 27, 2021).

[74] *Id.*

least one opioid prescription in Kitsap County was 100 per 1,000 persons, across all age groups.[75] However, that figure was significantly higher for older adults; for the 55-64 age group in the same quarter, for example, the rate was 157.9 per 1,000.[76]

190.    Kitsap County has been a leader in confronting the emergency caused by Defendants' reckless promotion and distribution of prescription opioids. The County's public health administrators were among the first to recognize the profound impacts opioids were having on the community, and they and the County have taken groundbreaking actions to address the fallout from this crisis.

191.    In September 2016, Kitsap County worked with neighboring Jefferson and Clallam Counties as part of a project known as Olympic Community of Health to initiate the Three-County Coordinated Opioid Response Project (3CCORP), a multi-sector collaborative effort to address the opioid epidemic in the region. Kitsap County provides extensive staff time to support 3CCORP's efforts.

192.    Within 3CCORP, members have formed three workgroups to address (1) Overdose Prevention, (2) Treatment, and (3) Prevention. The Overdose Prevention Workgroup's work includes, for example, identifying baseline metrics for overdose response and finding ways to increase training and the availability of naloxone. The Prevention Workgroup is working on reforming prescribing practices through the Six Building Blocks to Safer Opioid Prescribing model,[77] developed by researchers at the University of Washington and Group Health (now Kaiser) Research Institute in Seattle, and is aimed at revising chronic opioid therapy practices in primary care clinics.[78]

---

[75] *Opioid Prescription and Drug Overdoses County Data*, Wash. St. Dep't of Health, https://www.doh.wa.gov/DataandStatisticalReports/HealthDataVisualization/OpioidPrescriptionsandDrugOverdosesCountyData (last visited Oct. 27, 2021).

[76] *Id.*

[77] *Six Building Blocks*, https://www.improvingopioidcare.org/ (last visited Oct. 27, 2021).

[78] Michael L. Parchman, MD, MPH, Michael Von Korff, PhD, Laura-Mae Baldwin, MD, Mark Stephens, BS, Brooke Ike, MPH, DeAnn Cromp, MPH, Clariss Hsu, PhD, and Ed H. Wagher, MD, MPH, *Primary Care Clinic Re-Design for Prescription Opioid Management*, 30(1) JABFM 44-51 (Jan.-Feb. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5228596/.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3000
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

193.    The Treatment Workgroup collaborated and successfully obtained Washington State Department of Social and Health Services funding to support a "hub and spoke" model of treatment for opioid-use disorder. Now being adapted and implemented in various regions after its success in Vermont,[79] the "hub and spoke" model provides specialized substance-use disorder treatment in a "hub" with care managers in several "spokes." In Washington State's adaptation of the model, the hub must be a primary care clinic, a community-based health center, or an opioid treatment program, capable of providing on site at least two of the three FDA-approved medications for opioid-use disorder (methadone, buprenorphine, and naltrexone), with a minimum of two waivered providers, a nurse care manager, and a care coordinator. A minimum of five spokes must each have a care coordinator and offer supportive recovery services such as counseling, but can include locations such as syringe exchange programs or correctional facilities, as the goal of the spokes is offer low barriers for accessing treatment. While the 3CCORP Treatment Workgroup recognized that ideally each of the three counties would have a hub, currently available resources limit the model to one hub for the three counties. Peninsula Community Health Services in Kitsap County was selected as the "hub." As of March 2018, the project had already surpassed its treatment induction goal with 260 treatment inductions.

---

[79] John R. Brooklyn, MD and Stacey C. Sigmon, PhD, *Vermont Hub-and-Spoke Model of Care For Opioid Use Disorder: Development, Implementation, and Impact*, 11(4) J Addict Med 286-292 (July-Aug. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5537005/.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1
2
3
4
5
6
7
8
9
10
11
12



13    194.    The Kitsap Public Health District, which Kitsap County provides partial funding,

14 also offers a syringe exchange to Kitsap County residents at two separate locations. The first

15 location is in its main office in Bremerton, the largest city in Kitsap County, and the second

16 operates through a contractor who provides mobile exchange of needles from private residences

17 in the County.

18    195.    Despite these efforts to combat the epidemic, the County continues to suffer the

19 consequences of Defendants' aggressive marketing scheme and excessive distribution of

20 prescription opioids. These consequences will continue well into the future. Each day that

21 Defendants continue to evade responsibility for the epidemic they caused, the County must

22 continue to allocate substantial resources to address it. And, to truly end the crisis in Kitsap

23 County will require resources the County does not have. The costs described in the following

24 sections are illustrative but not exhaustive examples of the significant burden the opioid crisis

25 has imposed on the County.

26

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1. **Kitsap County Human Services has incurred enormous costs in dealing with the crisis caused by Defendants.**

196.     Kitsap County Human Services ("KCHS") is responsible for delivery of services to some of the most vulnerable citizens in Kitsap County.

197.     As discussed above, Kitsap County has been a leader in the regional opioid response through 3CCORP. KCHS staff also participate in numerous other programs and regional activities, working in collaboration with other health jurisdictions, local tribal nations, the chemical dependency treatment community, and law enforcement to address the opioid crisis.

198.     In addition to supporting the implementation of the regional hub and spoke network, KCHS also supports the Kitsap Recovery Center, located in Port Orchard, which provides both inpatient and outpatient substance abuse treatment services. The facility houses 27 inpatient treatment beds and 9 sub-acute detoxification beds. Approximately 1,200 adult men and women each year receive chemical dependency treatment for drug addiction at Kitsap Recovery Center. It primarily serves low-income and Medicaid-eligible clients but also provides information, education, and referrals to all county residents. Further, Narcan (naloxone), and training for same, are provided to Kitsap Recovery Center staff, further incurring costs on KCHS.

199.     KCHS has devoted significant resources to combatting the opioid epidemic and will continue to do so into the foreseeable future. Ultimately, however, the resources the County has dedicated to combatting the opioid epidemic result in a loss of capacity to address other important public health programs, such as communicable disease investigations, immunizations, and well-child screening.

2. **The County's justice system—both criminal and civil—has incurred substantial costs in responding to the epidemic caused by Defendants.**

200.     The opioid epidemic has imposed serious costs and burdens on the County's criminal justice resources. The County has had more opioid-related crimes to investigate and prosecute, and the County jail now houses more people arrested or convicted for drug-related

COMPLAINT—CLASS ACTION - 46
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

crimes. But the costs aren't limited to the criminal justice system; on the civil side, the County has experienced a rise in the need for child-welfare interventions, including dependency proceedings and related services. While these actions are critical to keeping people safe in the County, the services are expensive and take resources away from the other work the County could be doing.

a.     **Kitsap County Prosecuting Attorney's Office and Public Defender Costs**

201.    The Kitsap County Prosecuting Attorney's Office ("PAO") represents the County in both criminal and civil matters, and is comprised of five separate divisions, including the Criminal, Civil, and Family Support Divisions. The opioid epidemic has had a significant impact on the PAO.

202.    For example, the PAO commonly sees defendants charged with opioid-related offenses. It has also seen a rise in heroin use in the last five years. The County offers alternatives to prosecution for opioid-related crimes, such as Adult and Juvenile Drug Courts, Veterans Court, Individualized Treatment Court, plus a Family Dependency Drug Court for juvenile dependency cases.

203.    The County is also responsible for paying for public defense costs. Although not every criminal prosecution involves a public defender, the majority of them do, and they represent a significant and serious cost to the County.

204.    Family support cases involving child support have also been affected by the prevalence of opioid addiction. When children are living in homes with one or both parents addicted to opioids, the County often must step in to protect the children, provide services, and address the resulting legal implications.

b.     **Kitsap County Sheriff's Office**

205.    The Kitsap County Sheriff's Office ("KCSO") safeguards lives and property throughout the entire County. As a result of the opioid epidemic, KCSO deals with opioid use

COMPLAINT—CLASS ACTION - 47
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

and abuse daily in its contacts with individuals. KCSO devotes substantial resources to opioid-related crimes.

206.    For example, KCSO officers commonly respond to opioid overdoses. The County expends resources equipping its officers with Narcan (naloxone) and training them on how to administer the lifesaving drug.

207.    KCSO officers are also exposed to syringes and needles on the job, an added nuisance and harm that is a direct result of the crisis. KCSO has also expended resources training its officers to safely handle fentanyl, which can be lethal in miniscule amounts and can be absorbed through the skin.

208.    KCSO also spends substantial time and resources responding to harms related to illicit opioids.  For example, where the market may have been created by prescription opioids, a very strong illegal and black market has resulted and provides an unchecked flow of illegal and dangerous drugs into Kitsap County. KCSO has borne the burden of addressing these harms.

### c.    Kitsap County Jail

209.    The Kitsap County Jail has experienced increased incarcerations for individuals arrested for opioid-related crimes. Jail medical staff also provides treatment to inmates for the treatment of opioid dependence, having inducted over 600 people into its Medication Assisted Treatment Program since 2018. The Kitsap County Jail has also developed a specific protocol for opioid detoxification to better address its needs.

210.    The Jail also has specific protocols to inspect all mail for opioid contraband but has had to increase training specifically due to increased issues associated with opioid contraband. The Kitsap County Jail has revamped its mail handling policy as to what is allowed to come into the facility due to this increased introduction of contraband. Further, the Kitsap County Jail incurred almost $200,000 to purchase a body scanner to assist in further eliminating contraband from entering the Jail.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

211.    While Kitsap County is committed to protecting and treating its inmates, the need for it imposes significant additional costs on the County.

3.    **The Kitsap County Parks Department is also not immune to Defendants' conduct.**

212.    The Kitsap County Parks Department ("Parks Department") has also been affected by the opioid epidemic. The Parks Department is responsible for overseeing and managing 10,843 acres of parklands throughout the County.

213.    The Parks Department and the people who use the Kitsap County parks are affected by the opioid crisis in a variety of ways, but primarily via exposure to used needles. The Parks Department incurs the financial expense of training parks personnel on how to safely handle and dispose of needles, as well as how to respond to drug-related activity including drug dealing, prostitution, homeless encampments, and weapons.

214.    The Parks Department also incurs the financial expense of repairing damaged property due to drug-related activities including damages to restrooms, water faucets, signage, park benches and tables, and playground equipment. The Parks Department is also negatively impacted by the opioid crisis when members of the public are afraid to visit Kitsap County Parks because they do not want to encounter opioid users or evidence of opioid use.

215.    Further, the City of Port Orchard recently issued two Notices of Violation to the Kitsap County Board of County Commissioners, demanding immediate action by the County or face daily fines of $250.00 and a lawsuit to abate the various health and safety violations created by homelessness and drug-related activity, including opioids, within Veterans Memorial Park, a 48-acre County-owned park located within the boundaries of the City.[80]

4.    **The opioid epidemic has also contributed to homelessness in Kitsap County.**

216.    Another effect of the opioid epidemic in Kitsap County is the persistence of the homelessness crisis in the County, despite the County's efforts to address it. Although the causes

---

[80] Jessie Darland, *City of Port Orchard to Kitsap County: Clean up Veterans Park*, Kitsap Sun (Nov. 6, 2021), https://www.kitsapsun.com/story/news/2021/11/06/city-port-orchard-kitsap-county-clean-up-veterans-park/6302044001/.

of homelessness are multi-faceted and complex, substance abuse is both a contributing cause and result of homelessness. In Kitsap County, the opioid epidemic has contributed to and compounded the problem of homelessness.

217.    According to the annual Washington State Point-In-Time Count, the number of homeless persons in Washington State grew 18.8% from 2013 to 2017. In Kitsap County in 2013, there were 240 homeless households.[81] In 2017, there were 517 homeless households in the County.[82]

218.    Prescription opioids have helped perpetuate homelessness by making it immeasurably more difficult for Kitsap County to address. For example, mental health services are critical for many in the homeless population, but opioid use and addiction can make it more difficult to provide effective mental health treatment. Opioids provide a way to self-medicate and avoid getting the treatment that might lead to long-term success and more positive outcomes. In addition, individuals using opioids regularly are unable to pass drug screenings to obtain employment. Whether opioid addiction was a contributing cause or a result of homelessness, opioid addictions now prevent many individuals from regaining permanent housing.

219.    Additionally, while the leading cause of death among homeless Americans used to be HIV, it is now drug overdose. A study published in JAMA Internal Medicine found that overdoses were the leading cause of death among individuals experiencing homelessness in the Boston area. Of the overdose deaths, 81% involved opioids.[83]

---

[81] *2013 Point in Time Count*, Wash. Dep't of Commerce (Jan. 2013), http://www.commerce.wa.gov/wp-content/uploads/2016/10/hau-pit-final-summary-2013.pdf.

[82] *2017 Point in Time Count*, Wash. Dep't of Commerce (Aug. 2017), http://www.commerce.wa.gov/wp-content/uploads/2017/12/CSHD-HAU-2017-County-Summary-August-2017v2.pdf.

[83] Travis P. Baggett, MD, MPH, Stephen W. Hwang, MD, MPH, James J. O'Connell, MD, et al., *Mortality Among Homeless Adults in Boston, Shifts in Causes of Death Over a 15-Year Period*, 173 (3) JAMA Intern Med 189-95 (2013), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/1556797#qundefined.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

**M.    The Washington Attorney General Expressly Did Not Release the Claims of Local Governments in its Settlement with McKinsey.**

220.    Although the attorneys general for virtually every state released the claims of local governments as a term for settling claims with McKinsey,[84] the Attorney General of Washington refused to release the claims of local governments in Washington's settlement agreement with McKinsey. The terms of Final Stipulated Consent Judgment, executed by McKinsey and the State of Washington on February 4, 2021, expressly state that "[n]othing contained herein shall prevent the Attorney General from taking the position that this Judgment/Order does not release claims brought by political subdivisions of this Settling State by giving McKinsey written notice within 15 days of the entry of the Consent Judgment." Final Stipulated Consent Judgment at ¶ VII(B)(4), *State of Washington v. McKinsey & Company, Inc., United States*, No. 21-2-01540-5 SEA (King Cty. Sup. Ct., Feb. 4, 2021). The Judgment further provides that "[i]f the Attorney General gives McKinsey the aforementioned written notice, McKinsey waives the ability to argue that the release in this Consent Judgment applies to political subdivisions of this Settling State." *Id.*

221.    The Washington Attorney General timely provided McKinsey with written notice on February 9, 2021, stating: "I am taking the position as provided for in Paragraphs VII(B)(4) that the aforementioned Final Stipulated Consent Judgment does not release claims of any political subdivisions in the State of Washington."[85] Accordingly, pursuant to Paragraph VII(B)(4) of the Final Stipulated Consent Judgment, McKinsey has waived any argument that its Settlement with the State of Washington has released any claims brought by Plaintiff.

222.    This position is consistent with Washington law, which clearly establishes that the Attorney General shall *only* represent the "state … in the courts … in all legal of quasi legal

---

[84] *See, e.g.*, *McKinsey's Opioid Woes Far From Over Despite $600M Deals*, Law360 (Feb. 16, 2021 11:00pm EST), https://www.law360.com/articles/1355339/mckinsey-s-opioid-woes-far-from-over-despite-600m-deals.

[85] *See* Ex. B to Decl. of David J. Ko in Supp. of King Cnty. and Skagit Cnty.'s Resp. to Def. McKinsey's Mot. for Transfer of Actions, *In re: McKinsey & Co., Inc., Nat'l Prescription Opiate Consultant Litig.*, MDL Docket No. 2996 (J.P.M.L. Mar. 30, 2021), ECF No. 44-3.

matters …" RCW 43.10.040. Furthermore, the Washington Attorney General's Office acknowledges that it "is not responsible for representing city, county, or other local units of government." *See Roles of the Office*, Washington State Office of the Attorney General, https://www.atg.wa.gov/roles-office (last visited Sept. 23, 2021).

## N.    No Federal Agency Action, Including by the FDA, Can Provide the Relief Kitsap County Seeks Here.

223.    The injuries Kitsap County has suffered and will continue to suffer cannot be addressed by agency or regulatory action. There are no rules the FDA could make or actions the agency could take that would provide Kitsap County the relief it seeks in this litigation.

224.    Even if prescription opioids were entirely banned today or only used for the intended purpose, millions of Americans, including Kitsap County residents, would remain addicted to opioids, and overdoses will continue to claim lives. The County will respond to related medical emergencies and administer naloxone. The Sheriff's Office will continue to spend extraordinary resources combatting illegal opioid sales, and the Office of the County Prosecutor, the Public Defenders' office, and County courts will remain burdened with opioid-related crimes. Social services and public health efforts will continually be stretched thin.

225.    Regulatory action would do nothing to compensate the County for the money and resources it has already expended addressing the impacts of the opioid epidemic and the resources it will need in the future. Only this litigation has the ability to provide the County with the relief it seeks.

226.    Furthermore, the costs Kitsap County has incurred in responding to the opioid crisis and in rendering public services described above are recoverable pursuant to the causes of actions raised by the County. Defendants' misconduct alleged herein is not a series of isolated incidents, but instead the result of a sophisticated and complex marketing scheme over the course of more than twenty years that has caused a substantial and long-term burden on the municipal services provided by the County. In addition, the public nuisance created by Defendants and the

County's requested relief in seeking abatement further compels Defendants to reimburse and compensate Kitsap County for substantial costs they have spent addressing the crisis caused by Defendants.

## V.     FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RICO ACT: THE OPIOID MARKETING ENTERPRISE

**A.     The Common Purpose and Scheme of the Opioid Marketing Enterprise.**

227.    Opioid manufacturers, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and Mallinckrodt, together with McKinsey, which participated in the marketing and sale of opioids as described in this Complaint, (collectively, the "RICO Marketing Enterprise Members") engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market—through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

228.    In order to unlawfully increase the demand for opioids, the RICO Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise"). Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The RICO Marketing Enterprise Members' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the U.S. opioid epidemic.

229.    The RICO Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiff and the Class, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the RICO Marketing

Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

230.    The scheme devised, implemented and conducted by the RICO Marketing Enterprise Members was a common course of conduct designed to ensure that the RICO Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the RICO Marketing Enterprise Members' drugs. The RICO Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme.

231.    There was regular communication between the RICO Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The RICO Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

232.    As public scrutiny and media coverage focused on how opioids ravaged communities in throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

233.    The RICO Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. The Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid

COMPLAINT—CLASS ACTION - 54
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Marketing Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic.

234. The impact of the Opioid Marketing Enterprise's scheme is still in place—i.e., the opioids continue to be prescribed and used for chronic pain throughout the United States, including in Kitsap County and other counties and cities in Washington, and the epidemic continues to injure Plaintiff and the Class and consume the resources of Plaintiff and the Class.

235. As a result, it is clear that the RICO Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**B.    The Conduct of the Opioid Marketing Enterprise Violated Civil RICO.**

236. From at least 2004 to the present, each of the RICO Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

A.    Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

B.    Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

C.      Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

D.      Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints;

E.      Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

F.      Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids.

237.    The scheme devised and implemented by the RICO Marketing Enterprise Members amounted to a common course of conduct intended to increase the RICO Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

**C.      Pattern of Racketeering Activity.**

238.    The RICO Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

239.    The pattern of racketeering activity used by the RICO Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and

material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from the increased sales of the RICO Marketing Enterprise Members' drugs that occurred because consumers, prescribers, regulators, Plaintiff, and the Class relied on the RICO Marketing Enterprise Members' misrepresentations.

240.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the RICO Marketing Enterprise Members defrauded and intended to defraud consumers, prescribers, regulators, Plaintiff, the Class, and other intended victims.

241.    The RICO Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. The RICO Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations deviated from the FDA-approved use of these drugs and were not supported by actual evidence. The RICO Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities with the specific intent to advance, and for the purpose of executing, their illegal scheme.

242.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, the RICO Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

243.    The RICO Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

A.      Marketing materials about opioids and their risks and benefits, which the RICO Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, published, and transmitted to front groups and KOLs located across the country, including in Kitsap County and other Washington counties and cities;

B.      Written representations and telephone calls among the RICO Marketing Enterprise Members and between the RICO Marketing Enterprise Members and front groups regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of opioids for chronic, long-term pain generally;

C.      Written representations and telephone calls among the RICO Marketing Enterprise Members and between the RICO Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of chronic, long-term pain generally;

D.      E-mails, telephone calls, and written communications among the RICO Marketing Enterprise Members and between the RICO Marketing Enterprise Members and front groups agreeing to or implementing the opioids marketing scheme;

E.      E-mails, telephone calls, and written communications among the RICO Marketing Enterprise Members and between the RICO Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

F.      Communications among the RICO Marketing Enterprise Members and between the RICO Marketing Enterprise Members, front groups, and the media regarding the publication, drafting, and dissemination of treatment guidelines as part of the Opioid Marketing Enterprise;

G.      Written and oral communications directed to the public, including residents of Kitsap County and other Washington counties and cities, and governmental entities, including Plaintiff and the Class, that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

COMPLAINT—CLASS ACTION - 58
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

H.     Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

244.    In addition to the above-referenced predicate acts, it was intended by and foreseeable to the RICO Marketing Enterprise Members that the front groups and the KOLs would distribute publications through the U.S. Mail and interstate wire facilities and that claimed the benefits of using opioids for chronic pain outweighed the risks of doing so.

245.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the RICO Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators, Plaintiff, and the Class: (a) the fraudulent nature of the RICO Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the RICO Marketing Enterprise Members and by their KOLs, front groups, and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

246.    The RICO Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the RICO Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

247.    Indeed, for the RICO Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This conclusion is supported by the fact that opioid manufacturers among the RICO Marketing Enterprise Members financed, supported, and worked through the same KOLs and Front groups, and often collaborated on and mutually supported the same publications, Continuing Medical Education programs (CMEs), presentations, and prescription guidelines.

248.    The RICO Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff and the Class, while

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

simultaneously generating billion-dollar revenue and profits for the RICO Marketing Enterprise Members. The predicate acts were committed or caused to be committed by the RICO Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## VI.    TOLLING OF STATUTES OF LIMITATIONS

249.    At all times relevant to this Complaint, McKinsey and Purdue took active steps to conceal their unlawful activities, including through the conspiracy alleged herein. For example and without limitation, McKinsey, Purdue, and their co-conspirators concealed their efforts to (i) circumvent the restrictions of the CIA in order to increase the sale of opioids; and (ii) further boost the sale of opioids after the expiration of the CIA, including through "Project Turbocharge" and "Evolve to Excellence." McKinsey, Purdue, and their co-conspirators further undertook active efforts to deceive Plaintiff, the Class, and the general public, thus concealing their unlawful conduct, including by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain, creating and implementing a deceptive opioid marketing strategy, omitting or concealing material facts, and failing to correct prior misrepresentations and omissions about the purported benefits and risks of opioids.

250.    **Discovery Rule:** McKinsey's consulting services were given confidentially, and the content of those services was not public. Plaintiff did not have knowledge of the scope, magnitude, and unlawful nature of McKinsey's conduct until 2020, when documents produced in the Purdue bankruptcy proceeding revealed details regarding McKinsey's role in advising Purdue and working with Purdue to implement the unlawful conduct detailed in this Complaint.[86] Information in the public domain was insufficient to place Plaintiff and the Class on inquiry notice of McKinsey's unlawful, unfair, and deceptive activities prior to 2020. For these reasons, any statutes of limitations applicable to the claims of Plaintiff and the Class did not begin to run and have been tolled until 2020.

---

[86] *See* Bogdanich & Forsythe, *supra* note 64.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

251.    **Fraudulent Concealment:** The statutes of limitation were further tolled by the doctrine of fraudulent concealment. McKinsey, Purdue, and their co-conspirators actively concealed the existence of their unlawful scheme, including through false or misleading representations. Despite the requirements of the CIA, which restrained Purdue from making any deceptive or misleading claims about OxyContin, McKinsey devised a strategy and worked with Purdue to implement the strategy to maximize the sale of opioids, including through deceptive and misleading claims regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions, but devised and implemented a strategy to spread these deceptive and misleading claims to health care providers, consumers, Plaintiff, the Class, and the public in order to boost sales of opioids, including Oxycontin, despite the public impression that Purdue had corrected its conduct as a result of the CIA.

252.    McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

253.    McKinsey's fraudulent concealment prevented Plaintiff and the Class from discovering the scope, magnitude, and unlawful nature of McKinsey's conduct until 2020, when documents produced in the Purdue bankruptcy proceeding revealed details regarding McKinsey's role in advising Purdue and working with Purdue to implement the unlawful conduct detailed in this Complaint.

254.    **Continuing Tort:** McKinsey is estopped from relying on any statute of limitations defense because its illegal, deceptive, and fraudulent practices as alleged herein, which were continuing in nature, have created continuing and repeated injuries to Plaintiff and the Class.

# VII.   CLASS ACTION ALLEGATIONS

## A.   Class Definitions.

255.   Pursuant to provisions of the Federal Rules of Civil Procedure ("Rule") 23(a), (b)(2), and (b)(3), Plaintiff brings this action on behalf of themselves and a proposed class of other similarly situated counties and cities, defined as follows:

> All counties and cities in Washington State that have spent resources addressing or have been impacted by the opioid epidemic.

256.   Plaintiff reserves the right to modify the definition of the Class or add Sub-Classes prior to class certification.

257.   Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of its claims regarding liability and entitlement to injunctive relief, abatement, and damages on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

258.   This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23.

## B.   Requirements of Rule 23.

259.   The Class consists of 39 counties and hundreds of cities in Washington State and is therefore so numerous and geographically dispersed that it would be impractical to join all Class Members before the Court.

260.   There are numerous and substantial questions of law or fact common to all of the members of the Class and which predominate over any individual issues. Included within the common question of law or fact are:

a.   Whether McKinsey engaged in the conduct alleged herein;

b.   Whether McKinsey created a public nuisance;

c.   Whether McKinsey unlawfully contributed to a public nuisance;

d.   Whether McKinsey substantially caused or contributed to the opioid epidemic;

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

e.   Whether McKinsey's conduct injured or endangered the health and safety of Washington counties and cities and their communities;

f.   Whether McKinsey engaged in a pattern of deceptive, fraudulent and/or improper activity;

g.   Whether McKinsey and the other RICO Marketing Enterprise Members formed the Opioid Marketing Enterprise for the purpose of effectuating their fraudulent schemes;

h.   Whether the Opioid Marketing Enterprise used the U.S. mails and interstate wire facilities to carry out its fraudulent scheme;

i.   Whether the Opioid Marketing Enterprise engaged in a pattern of racketeering;

j.   Whether McKinsey's conduct, in whole or in part, has substantially affected interstate and intrastate commerce;

k.   Whether McKinsey engaged in conduct that violated the federal racketeering laws as alleged herein;

l.   Whether McKinsey's conduct was unfair or deceptive, in violation of the Washington Consumer Protection Act;

m.   Whether Plaintiff and members of the Class are entitled to abatement; and

n.   Whether Plaintiff and the other members of the Class were injured by McKinsey's conduct and, if so, the appropriate class-wide measure of damages;

o.   Whether McKinsey wase unjustly enriched; and

p.   Whether Plaintiff and the other members of the Class are entitled to injunctive relief.

261.    Plaintiff's claims are typical of the claims of Class Members, in that they share the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiff and McKinsey's conduct affecting Class Members, and Plaintiff has no interests adverse to the interests other Class Members.

262.    Plaintiff will fairly and adequately protect the interests of Class Members and has retained counsel experienced and competent in the prosecution of complex class actions including complex questions that arise in consumer protection litigation.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

263.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against McKinsey, so it would be impracticable for members of the Class to individually seek redress for McKinsey's wrongful conduct.

264.     Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VIII.   CLAIMS FOR RELIEF

## COUNT ONE — VIOLATION OF RICO, 18 U.S.C. § 1961, *et seq.*

265.     Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

266.     Plaintiff brings this Count on behalf of itself and the Class.

267.     This claim is brought by Plaintiff against Defendant McKinsey for actual damages, treble damages, and equitable relief under 18.U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq*.

268.     At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

269.     Plaintiff and the members of the Class are "persons," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue as they were and are injured in their business and/or property as a result of McKinsey's wrongful conduct described herein.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

270.     The RICO Marketing Enterprise Members' conducted an association-in-fact enterprise and/or participated in the conduct of an enterprise through a pattern of illegal activities the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise, the RICO Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use. In so doing, each of the RICO Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud, in violation of 18 U.S.C. §§ 1962(c) and (d).

271.     The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the RICO Marketing Enterprise Members.

272.     Each of the RICO Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

273.     Specifically, the RICO Marketing Enterprise Members each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

274. Further, each of the RICO Marketing Enterprise Members had systematic links to, and personal relationships with, each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the RICO Marketing Enterprise Members coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the RICO Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

275. At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each RICO Marketing Defendant and its members; (b) was separate and distinct from the pattern of racketeering in which the RICO Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the RICO Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

276. The RICO Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids and expand the market for opioids.

COMPLAINT—CLASS ACTION - 66
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

277.    The RICO Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the RICO Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail, and interstate wire facilities. The RICO Marketing Enterprise Members participated in the scheme to defraud by using mail, telephones, and the Internet to transmit communications and payments in interstate or foreign commerce.

278.    The RICO Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

A.     Mail Fraud: The RICO Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

B.     Wire Fraud: The RICO Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

279.    As summarized herein, the RICO Marketing Enterprise Members used the mail and wires to send or receive thousands of communications, publications, representations,

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

statements, electronic transmissions, and payments to carry out the Opioid Marketing
Enterprise's fraudulent scheme.

280.    Because the RICO Marketing Enterprise Members disguised their participation in
the enterprise, and worked to keep even the enterprise's existence secret so as to give the false
appearance that their false messages reflected the views of independent third parties, many of the
precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire
facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot
be alleged without access to the books and records maintained by the RICO Marketing
Enterprise Members, front groups, and KOLs. Indeed, an essential part of the successful
operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. However,
Plaintiff has described the occasions on which the RICO Marketing Enterprise Members
disseminated misrepresentations and false statements to consumers, prescribers, regulators,
Plaintiff, and the Class, and how those acts were in furtherance of the scheme.

281.    Each instance of racketeering activity alleged herein was related, had similar
purposes, involved the same or similar participants and methods of commission, and had similar
results affecting similar victims, including consumers, prescribers, regulators, Plaintiff, and the
Class. The RICO Marketing Enterprise Members calculated and intentionally crafted the scheme
and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained
high. In designing and implementing the scheme, the RICO Marketing Enterprise Members
understood and intended that those in the distribution chain rely on the integrity of the
pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific
evidence regarding the RICO Marketing Enterprise Members' products.

282.    The RICO Marketing Enterprise Members' pattern of racketeering activity
alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other.
Likewise, the RICO Marketing Enterprise Members are distinct from the Opioid Marketing
Enterprise.

COMPLAINT—CLASS ACTION - 68
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

283.    The racketeering activities conducted by the RICO Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, Plaintiff, and the Class. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, Plaintiff, and the Class. The RICO Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

284.    Each of the RICO Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

285.    As described herein, the RICO Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

286.    The RICO Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff and the Class injury in their business and property. The RICO Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic. The injuries of Plaintiff and the Class, as described herein, were not unexpected, unforeseen, or independent. Rather, as Plaintiff alleges, the RICO Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.

COMPLAINT—CLASS ACTION - 69
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

Nevertheless, the RICO Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

287.    It was foreseeable and expected that the RICO Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

288.    The Opioid Marketing Enterprise's misleading marketing and failure to prevent prescription opioid diversion damaged Plaintiff and the Class. The Opioid Marketing Enterprise's misconduct has contributed to a range of social problems, including violence and delinquency. Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair. As a result, more and more of the resources of Plaintiff and the Class are devoted to responding to the opioid epidemic.

289.    Specifically, the RICO Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme has injured Plaintiff and the Class in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic. The injuries to Plaintiff and the Class, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

> A.    Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

> B.    Costs of training first responders in the proper treatment of drug overdoses;

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

C.    Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

D.    Costs associated with emergency responses by first responders to opioid overdoses;

E.    Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

F.    Costs associated with the injuries to the health and welfare of the residents of Kitsap County and other Washington counties and cities caused by the opioid epidemic;

G.    Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation;

H.    Losses caused by the diversion of revenue to address the opioid epidemic that would otherwise have been used to provide other services; and

I.    Costs associated with removal of hazardous waste from communities of Plaintiff and the Class, including on real property of Plaintiff and the Class.

290.    The injuries to Plaintiff and the Class were directly and proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of the injuries to Plaintiff and the Class. But for the opioid-addiction epidemic the RICO Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiff and the Class would not have lost money or property, and the health and welfare of residents of Kitsap County and other Washington counties and cities would not have been harmed.

291.    Plaintiff seeks, on behalf of itself and the Class, all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communications, actions, and

programs; forfeiture, as deemed proper by the Court; attorney's fees; all costs and expenses of suit; and pre- and post-judgment interest.

## COUNT TWO — NEGLIGENCE

292.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

293.    Plaintiff brings this Count on behalf of itself and the Class.

294.    Under Washington law, a cause of action arises for negligence when a defendant owes a duty to a plaintiff and breaches that duty, and proximately causes the resulting injury. *Iwai v. State*, 129 Wn. 2d 84, 96, 915 P.2d 1089 (1996).

295.    McKinsey, in its work with Purdue, owed a duty of care to Plaintiff and the Class, including but not limited to taking reasonable steps not to encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

296.    In violation of this duty, for years McKinsey devised, and assisted Purdue with implementing. a sales and marketing campaign, including Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed to the residents of Kitsap County and other Washington counties and cities. In the process, McKinsey continually devised misleading claims regarding OxyContin as part of their efforts to get health care providers to write more and more OxyContin prescriptions.

297.    As a direct and proximate result of McKinsey's negligent conduct, Plaintiff and the Class suffered and will continue to suffer harm, and are entitled to damages in an amount to be determined at trial.

## COUNT THREE — GROSS NEGLIGENCE

298.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

299.    Plaintiff brings this Count on behalf of itself and the Class.

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

300.    The oversupply of opioids and plague of addiction led to a widespread epidemic of overdoses, illness, and death that claimed thousands of lives and cost many millions of dollars of public spending—circumstances that constituted an imminent or clear and present danger amounting to more than normal and usual peril.

301.    McKinsey, in its work with Purdue, owed a duty of care to Plaintiff and the Class, including but not limited to taking reasonable steps not to encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

302.    In violation of this duty, for years McKinsey devised, and assisted Purdue with implementing, a sales and marketing campaign, including Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed to the residents of Kitsap County and other Washington counties and cities. In the process, McKinsey continually devised misleading claims regarding OxyContin as part of their efforts to get health care providers to write more and more OxyContin prescriptions.

303.    McKinsey's actions endangered the health and safety of residents of Kitsap County and other Washington counties and cities in a manner that is substantially and appreciably greater than ordinary negligence.

304.    As a direct and proximate result of McKinsey's grossly negligent conduct, Plaintiff and the Class suffered and will continue to suffer harm, and are entitled to damages in an amount to be determined at trial.

## COUNT FOUR — PUBLIC NUISANCE

305.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

306.    Plaintiff brings this Count on behalf of itself and the Class.

307.    Pursuant to RCW 7.48.010, an actionable nuisance is defined as, inter alia, "whatever is injurious to health or indecent or offensive to the senses."

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

308.    Pursuant to RCW 7.48.130, "[a] public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal."

309.    The residents of Kitsap County and other Washington Counties and Cities have a right to be free from conduct that endangers their health and safety. Yet McKinsey, in the course of its business with Purdue, engaged in conduct which endangers or injures the health and safety of the residents of Kitsap County and other Washington counties and cities by devising and assisting Purdue with implementing a sales and marketing campaign, including Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed to the residents of Kitsap County and other Washington counties and cities in a manner that substantially interferes with the welfare of Kitsap County and other Washington counties and cities.

310.    McKinsey, in its work with Purdue and other opioid industry participants, has created or assisted in the creation of a condition that is injurious to the health and safety of Plaintiff, the Class, and their residents, and interferes with the comfortable enjoyment of life and property of entire communities and/or neighborhoods in Kitsap County and other Washington counties and cities due to the massive distribution of millions of doses of opioids.

311.    McKinsey's conduct has caused deaths, serious injuries, and a severe disruption of the public peace, order, and safety. McKinsey and Purdue knowingly exacerbated a condition that affects entire municipalities, towns, and communities. McKinsey's conduct, including its misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, have fueled an opioid epidemic within Kitsap County and other Washington counties and cities that constitutes a public nuisance.

312.    The health and safety of the residents of Kitsap County and other Washington counties and cities, including those who use, have used, or will use opioids, as well as those

COMPLAINT—CLASS ACTION - 74
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

affected by others' opioid use, are matters of substantial public interest and of legitimate concern to the citizens and residents of Kitsap County and other Washington counties and cities.

313.    McKinsey's conduct has affected and continues to affect a substantial number of people within Kitsap County and other Washington counties and cities and is likely to continue causing significant harm.

314.    But for McKinsey's actions, opioid use—and, ultimately, misuse and abuse—would not be as widespread as it is today, and the opioid epidemic that currently exists would have been averted.

315.    McKinsey's conduct, including its misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, constitutes unlawful acts and/or omissions of duties, that annoy, injure, or endanger the comfort, repose, health, and/or safety of others.

316.    Logic, common sense, justice, policy, and precedent indicate McKinsey's unfair and deceptive conduct has caused the damage and harm complained of herein. McKinsey knew or reasonably should have known that, in devising and assisting Purdue with implementing a sales and marketing campaign, including Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed to the residents of Kitsap County and other Washington counties and cities, it would endanger the health and safety of residents of Kitsap County and other Washington counties and cities. Thus, the public nuisance caused by McKinsey to Kitsap County and other Washington counties and cities was reasonably foreseeable, including the financial and economic losses incurred by Plaintiff and the Class.

317.    As a direct and proximate result of the wrongful conduct of McKinsey as set forth herein, McKinsey negligently, intentionally, and/or unreasonably interfered with the rights of Kitsap County, the Class, and their residents to be free from unwarranted injuries, addictions, diseases, sicknesses, overdoses, and criminal actions, and have caused ongoing damage, harm, and inconvenience to Kitsap County, the Class, and their residents who have been exposed to the risk of addiction to prescription drugs, who have become addicted, and/or have suffered other

adverse consequences from the use of the addictive prescriptions drugs, and have been adversely affected by the addiction and abuse of others in their communities from the highly addictive, prescription pain medication

318.    In addition, engaging in any business in defiance of a law regulating or prohibiting the same is a nuisance per se under Washington law. McKinsey's conduct described herein of deceptively marketing or excessively distributing opioids violates RCW 7.48.010 and therefore constitutes a nuisance *per se*.

319.    As a direct and proximate cause of McKinsey's conduct creating or assisting in the creation of a public nuisance, Plaintiff, the Class, their communities, and their residents have sustained and will continue to sustain substantial injuries.

320.    Pursuant to RCW 7.48.020, Kitsap County, on behalf of itself and the Class, requests an order providing for abatement of the public nuisance that McKinsey has created or assisted in the creation of, and enjoining McKinsey from future violations of RCW 7.48.010.

321.    Kitsap County, on behalf of itself and the Class, also seeks the maximum statutory and civil penalties permitted by law as a result of the public nuisance created by McKinsey.

## COUNT FIVE — CIVIL CONSPIRACY

322.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

323.    Plaintiff brings this Count on behalf of itself and the Class.

324.    McKinsey and Purdue, working together for many years, agreed to commit numerous unlawful acts relating to the sales and marketing of Purdue's opioid products. McKinsey and Purdue also agreed to use unlawful means to commit lawful acts as part of these sales and marketing efforts.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

325.   McKinsey and Purdue agreed to pursue the unlawful act of knowingly misrepresenting the addictive nature of opioids in marketing OxyContin to health care providers within Kitsap County and other Washington counties and cities.

326.   McKinsey and Purdue deployed the unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of HHS for the five years Purdue was subject to a CIA after it pled guilty in 2007 to criminal misbranding. McKinsey assisted Purdue with evading these compliance obligations to accomplish the lawful act of maximizing OxyContin revenue to Purdue.

327.   McKinsey and Purdue further conspired to violate the Washington Consumer Protection Act. McKinsey and Purdue engaged in a pattern of unfair methods of competition, and unfair and/or deceptive conduct pursuant to a common practice of making and causing to be made misrepresentations and omissions in the marketing of opioids in general, and Purdue's opioids, specifically, that deceived or could reasonably be expected to deceive or mislead consumers.

328.   McKinsey and Purdue engaged in unfair methods of competition, and unfair and/or deceptive conduct, including: intentionally downplaying the risks, overstating the benefits, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically, including for off-label uses. These practices offend established public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

329.   McKinsey knowingly made or caused to be made false or misleading representations as to the characteristics, ingredients, uses, and benefits of opioids, generally, and Purdue's opioids, specifically, by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically.

COMPLAINT—CLASS ACTION - 77
(2:21-cv-01564)

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

330.    McKinsey, a majority of the Purdue board of directors, and Purdue agreed to deploy unlawful sales and marketing tactics to achieve the lawful purpose of maximizing revenue of a closely-held company.

331.    As a consequence, McKinsey is jointly and severally liable with Purdue for the sales and marketing practices used to promote Purdue's opioid products including OxyContin.

332.    Plaintiff and the Class were damaged as a result of unlawful acts McKinsey conspired with Purdue to commit.

## COUNT SIX — CIVIL AIDING AND ABETTING

333.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

334.    Plaintiff brings this Count on behalf of itself and the Class.

335.    McKinsey gave substantial assistance and encouragement to Purdue and the Sacklers regarding conduct McKinsey knew to be tortious and/or in violation of a duty owed by Purdue and the Sacklers to third persons, including Plaintiff and the Class.

336.    Plaintiff and the Class were damaged as a result of the specific conduct that McKinsey encouraged and substantially assisted with, in an amount to be proven at trial.

## COUNT SEVEN — UNJUST ENRICHMENT

337.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

338.    Plaintiff brings this Count on behalf of itself and the Class.

339.    McKinsey had a duty to take reasonable steps not to encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

340.    Rather than prevent or mitigate the wide proliferation of opioids into Kitsap County and other Washington counties and cities, for years McKinsey devised, and assisted Purdue with implementing, a sales and marketing campaign, including Project Turbocharge, that

COMPLAINT—CLASS ACTION - 78
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

would dramatically increase the amount of OxyContin prescribed and distributed to the residents of Kitsap County and other Washington counties and cities. In the process, McKinsey continually devised misleading claims regarding OxyContin as part of their efforts to get health care providers to write more and more OxyContin prescriptions.

341.    For McKinsey's work increasing opioid sales for Purdue in violation of McKinsey's duties, McKinsey was compensated out of Purdue's income from the sale of opioids.

342.    McKinsey therefore received a benefit from the sale and distribution of prescription opioids to and in Kitsap County and other Washington counties and cities.

343.    This compensation for increasing the sales of Purdue's deadly products constitutes money in the possession of McKinsey that, in equity and good conscience, McKinsey ought not be allowed to retain.

344.    Plaintiff and the Class are entitled to recover damages on its unjust enrichment claim in an amount to be proven at trial.

### COUNT EIGHT — VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT, RCW 19.86, *et seq.*

345.    Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

346.    Plaintiff brings this Count on behalf of itself and the Class.

347.    The Washington Consumer Protection Act ("CPA") is codified at RCW 19.86, *et seq*. The CPA establishes a comprehensive framework for redressing the violations of applicable law, and counties and municipalities of Washington State like Kitsap County can enforce the CPA and recover damages. RCW 19.86.090. The conduct at issue in this case falls within the scope of the CPA.

348.    The CPA prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. McKinsey engaged in a pattern of unfair

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

methods of competition, and unfair and/or deceptive conduct pursuant to a common practice of misleading the public regarding the purported benefits and risks of opioids.

349.   McKinsey, at all times relevant to this Complaint, directly and/or through its creation and implementation, together with Purdue, of Purdue's opioid marketing strategy, violated the CPA by making unfair and/or deceptive representations about the use of opioids to treat chronic and non-cancer pain, including to physicians and consumers in Kitsap County and other Washington counties and cities. McKinsey, directly and/or through its creation and implementation, together with Purdue, of Purdue's opioid marketing strategy, also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of opioid use constitutes deceptive conduct prohibited by the CPA.

350.   These unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce were reasonably calculated to deceive Plaintiff, the Class, and consumers in Kitsap County and other Washington counties and cities, and did in fact deceive the Plaintiff, the Class, and consumers in Kitsap County and other Washington counties and cities.

351.   Plaintiff and the Class have paid money for health care costs associated with prescription opioids for chronic pain. Plaintiff and the Class have also paid significant sums of money treating those covered by its health insurance for other opioid-related health costs. McKinsey's misrepresentations have further caused Plaintiff and the Class have to spend substantial sums of money on increased law enforcement, emergency services, social services, public safety, and other human services, as described above.

352.   But for these unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce, Plaintiff and the Class have would not have incurred the costs related to the epidemic caused by McKinsey, as fully described above.

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

353.    Logic, common sense, justice, policy, and precedent indicate McKinsey's unfair and deceptive conduct has caused the damage and harm complained of herein. McKinsey knew or reasonably should have known that, in devising and assisting Purdue with implementing a sales and marketing campaign, including Project Turbocharge, that would dramatically increase the amount of OxyContin prescribed and distributed to the residents of Kitsap County and other Washington counties and cities, it would endanger the health and safety of residents of Kitsap County and other Washington counties and cities. Thus, the harms caused by McKinsey's unfair and deceptive conduct to Plaintiff and the Class were reasonably foreseeable, including the financial and economic losses incurred by Plaintiff and the Class.

354.    As a direct and proximate cause of McKinsey's unfair and deceptive conduct, (i) Plaintiff and the Class have sustained and will continue to sustain injuries, and (ii) pursuant to RCW 19.86.090, Plaintiff and the Class are entitled to actual and treble damages in amounts to be determined at trial, attorneys' fees and costs, and all other relief available under the CPA.

355.    The Court should also grant injunctive relief enjoining McKinsey from future violations of the CPA. McKinsey's actions, as complained of herein, constitute unfair competition or unfair, deceptive, or fraudulent acts or practices in violation of the CPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kitsap County respectfully requests the Court order the following relief:

A.    An Order certifying this class action pursuant to Rule 23 on behalf of the proposed Class;

B.    An Order that the conduct alleged herein violates the Washington CPA;

C.    An Order awarding treble damages pursuant to the Washington CPA;

D.    An Order that the conduct alleged herein constitutes a public nuisance under Washington law, including under RCW 7.48, *et seq*.;

E.    An Order that McKinsey abate the public nuisance that it caused;

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

F.    An Order that McKinsey is liable for civil and statutory penalties to the fullest extent permissible under Washington law for the public nuisance it caused;

G.    An Order that McKinsey was negligent under Washington law;

H.    An Order that McKinsey was grossly negligent under Washington law;

I.    An Order that McKinsey was unjustly enriched at the expense of Plaintiff and the Class;

J.    An Order that McKinsey's conduct constitutes violations of RICO, 18 U.S.C. § 1961, *et seq.*;

K.    An Order that McKinsey engaged in a civil conspiracy with Purdue, making McKinsey jointly and severally liable with Purdue for the damages of Plaintiff and the Class;

L.    An Order that McKinsey aided and abetted Purdue's tortious conduct;

M.    An Order that Plaintiff and the Class are entitled to recover all measure of damages permissible under the statutes identified herein and under common law;

N.    An Order that McKinsey is enjoined from the practices described herein;

O.    An Order that judgment be entered against McKinsey in favor of Plaintiff and the Class;

P.    An Order awarding attorneys' fees and costs pursuant to any applicable provision of law, including but not limited to under the Washington CPA; and

Q.    An Order awarding any other and further relief deemed just and proper, including pre-judgment and post-judgment interest on the above amounts.

COMPLAINT—CLASS ACTION - 82
(2:21-cv-01564)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

1

## JURY TRIAL DEMAND

2

Plaintiff demands a trial by jury on all claims and of all issues so triable.

3

DATED this 19th day of November, 2021.

4

**KITSAP COUNTY**                                    **KELLER ROHRBACK L.L.P.**

5

6
By */s/ Christine M. Palmer*                          By *s/ Lynn Lincoln Sarko*
Christine M. Palmer, WSBA #42560                     By *s/ Derek W. Loeser*
7
Deputy Prosecuting Attorney                          By *s/ Gretchen Freeman Cappio*
Kitsap County Prosecutor's Office                    By *s/ David J. Ko*
8
614 Division Street, MS-35A                          By *s/ Daniel P. Mensher*
Port Orchard, WA 98366                               By *s/ Matthew M. Gerend*
9
Phone: (360) 337-7004                                Lynn Lincoln Sarko, WSBA #16569
Fax: (360) 337-7083                                  Derek W. Loeser, WSBA #24274
10
Gretchen Freeman Cappio, WSBA #29576

11
David J. Ko, WSBA #38299
Daniel P. Mensher, WSBA #47719
12
Matthew M. Gerend, WSBA #43276
1201 Third Avenue, Suite 3200
13
Seattle, WA 98101
Tel: (206) 623-1900
14
Fax: (206) 623-3384

15
***Attorneys for Plaintiff***

16

17

18

19

20

21

22

23

24

25

26

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384